**GREEN MANAGEMENT
CORPORATION,**
Plaintiff,

v.

**UNITED STATES, Defendant.**

Nos. 90–445C, 91–1346C.

United States Court of Federal Claims.

Dec. 14, 1998.

Robert S. Gardner, Colorado Springs, Colorado, attorney of record for plaintiff, with whom was Hugh J. McClearn, Sherman & Howard, Denver, Colorado, of counsel.

R. Alan Miller, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. with whom were Director David M. Cohen, Assistant Director Jeanne E. Davidson, and Assistant Attorney General Frank W. Hunger, attorneys of record for the defendant.

## OPINION

HORN, District Judge.

This case is before the court on the parties' cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). The plaintiff, Green Management Corporation (Green Management), a Wyoming corporation, brought this action pursuant to the Contract Disputes Act of 1978(CDA), 41 U.S.C. §§ 601–613 (1988 & Supp. III 1991).

Before the court are claims against the United States arising from two contracts between Green Management and the Department of Housing and Urban Development (HUD) to provide area management broker services in Wyoming. For Contract No. 109–86–014 (the 1986 contract), plaintiff seeks award of damages to include the alleged lost profits that resulted from an alleged cardinal change to the 1986 contract,[1] or an equitable adjustment, including the expense of hiring additional employees, additional office expenses, the increased cost of a performance audit and a reasonable profit. In addition, plaintiff seeks termination settlement costs under the 1986 contract. For Contract No. 109–89–005 (the 1988 contract, effective December 1, 1988), Green Management seeks damages for the alleged bad faith termination of Green Management for default by HUD, to include lost profits and attorneys fees and costs. Plaintiff also requests that the court convert the default termination on the 1988 contract into a termination for the convenience of the government. Defendant filed a motion for summary judgment, and plaintiff filed a response to defendant's motion, as well as a cross-motion for summary judgment. Thereafter, defendant filed a reply, to which plaintiff filed a response. Because of apparently inadvertent omissions in defendant's original motion for summary judgment, the court subsequently allowed the defendant to refile its motion for summary judgment with corrections. For the reasons discussed below, defendant's motion for summary judgment is **GRANTED**.

## FACTS

On April 28, 1986, HUD issued a Request for Proposals (RFP) for area management broker (AMB) services on HUD single family acquired properties in the State of Wyoming.[2] Pursuant to a request made by HUD

---

1. These requests for relief resulting from an alleged cardinal change were originally filed as a separate case with this court. By motion filed with the court, plaintiff requested that the two claims that arose from the alleged cardinal change, which comprise case number 91–1346C, be consolidated with those claims alleged in case number 90–445C. The cases were consolidated as requested.

2. According to the joint stipulations filed by the parties in the above-captioned case, pursuant to Title II of the National Housing Act, as amended, 12 U.S.C. §§ 1 709–1710 (1994 & Supp. II 1996), HUD insures mortgages on single family properties. If the mortgagor defaults on a HUD-insured mortgage, the property is usually conveyed to HUD, which, in turn, contracts with a private business to maintain the property while HUD

during discussions with Green Management on its best and final offer (BAFO), Green Management submitted two technical proposals to HUD. One proposal contemplated the use of outside contractors and separating inspectors from contractors. The second proposal stated that the "inspectors will be independent from contractors," and "there will be no personal involvement with contractors, thereby eliminating partiality." The second proposal also included a two page list of contractors, subcontractors and suppliers, including plumbing and heating contractors, janitorial supply companies, carpet cleaners, lock changers and maintenance companies.

The language of the solicitation, as set forth in Section C(4), provided that the contractor would have the option either to perform maintenance services in-house or to subcontract such services:

### SECTION C—DESCRIPTION AND SPECIFICATIONS

\*　　\*　　\*

4. Specific Requirements.

The Contractor may provide their own personnel facilities, materials and equipment or subcontract to perform the work and provide the reports specified. In conducting the work, the Contractor may perform the following tasks for each assigned property on an actual cost reimbursable basis:

a. Winterizing of all water systems and equipment, of all vacant properties. Performance shall be completed within 48 hours after properties have been assigned to Contractor's inventory.

b. Removal from the premises of all trash and debris, both as to interior and grounds. Grounds are to include entire yard (front and back), garage and any out buildings such as a shed. Completion shall be within 5 days of property being assigned.

c. Securing the properties against unauthorized entry and damage by the elements and attach a HUD lockbox at the outset and thereafter as needed. Completion shall be within 5 days of property being assigned.

d. Contractor will provide total yard maintenance such as mowing the grass, trim shrubbery, cleanup, and disposal when applicable, or at the request of GTR, GTM, or Contracting Officer.

e. The Contractor shall be required to develop and submit, for prior approval, a snow removal plan for *all* properties in the Contractor's assigned inventory. Snow removal plan is to be submitted to Contracting Officer prior to September 30th of each year.

Sometime after HUD had issued the solicitation, HUD determined as a matter of policy that it would be a conflict of interest for the AMB to perform both the maintenance tasks set forth in Section C(4) and also to inspect the finished work. The contract, however, was signed on September 10, 1986, with the original language of the solicitation in Section C(4) included.

On September 10, 1986, HUD awarded Contract No. 109–86–014 for AMB servicing of all HUD-owned properties in Wyoming to Green Management.[3] By stipulation, the parties agree that the contract price per property monthly management fee was $46.00. Gerald D. Green, President of Green Management, executed the contract on behalf of Green Management and Melvin Roy Porter, the Contracting Officer for HUD, executed the contract on behalf of HUD. The contract contemplates the payment of a fee to the contractor for "real property management services on one-to-four single family properties acquired by the U.S. Department of Housing and Urban Development

---

attempts to sell it. These properties are referred to as HUD-owned properties. The entity that performed such management services, at the time relevant to both complaints in this case, was called an area management broker or AMB, and typically was responsible for the maintenance of all HUD-owned properties within a specific geographic location.

**3.** Prior to entering into Contract No. 109–86–014, Green Management had served as an AMB for HUD in parts of Wyoming in accordance with an earlier contract, designated No. 101–85–094 (the 1985 contract). Contract No. 101–85–094 is not at issue in the instant case.

(HUD)...." Pursuant to the contract, Green Management agreed to "provide the necessary professional, technical, and other personnel, all materials, equipment, supplies and facilities to manage properties in HUD's best interest, in accordance with the minimum requirements herein stated...." Section G(9) of the contract, entitled "Facilities, Materials, Labor and Services to be Furnished by the Contractor," states in part:

In consideration for compensation as negotiated by this contract, the Contractor agrees to perform in accordance with the following requirements at no additional expense to the Government:

 &ast; &ast; &ast;

d. SERVICES: The time, attention, and effort of the principals and employees regularly engaged in the established business of the Contractor to properly discharge the obligations and responsibilities of the Contractor as established hereunder, including supervision of all work submitted to the Government.

(1) This includes performance under all sections of this agreement, unless otherwise provided for in writing by the Contracting Officer.

Section H of the contract sets forth the procedures by which Green Management, as part of its management function, agreed to procure supplies, materials, equipment and services. For procurements under $1,000.00, Green Management was authorized to procure supplies, materials, equipment, and services on a non-competitive basis. For items or services over $1,000.00, but under $5,000.00, Green Management agreed to procure on a competitive basis. For items or services for which the cost was over $5,000.00, Green Management agreed that the contract for services would be between HUD and the provider of the services and that, if requested, Green Management would conduct the solicitation process. To this effect, Green Management agreed that when required and requested by HUD, it would "solicit quotations from three or more responsible Contractors and assist in the development and processing of repair or purchase orders...." Section H also required that Green Management conduct certain solicitations as small business set asides.

Section C(1) of the contract sets forth "costs to be borne by the Contractor as general management responsibilities unless otherwise specified herein...." As a general management responsibility, Green Management agreed under Section C(1)(b) of the contract, to "[o]perate and maintain acceptable property management procedures and systems." Procedures and systems covered by Section C(1)(b) of the contract included the procurement procedures and systems set forth in Section H of the contract. Section C(4) of the 1986 contract, which provides for maintenance services, is the identical language which appeared in Section (C)(4) of the solicitation.

Performance of the 1986 contract was suspended on September 12, 1986, due to a bid protest filed with the Comptroller General. Once the bid protest was resolved, performance was resumed. In a letter dated October 14, 1986, HUD extended the 1985 contract with Green Management, Contract No. 101–85–094, to provide area management broker services in Wyoming. During the pendency of the bid protest of the 1986 contract, HUD continued to release properties for AMB services to the plaintiff, pursuant to the plaintiff's pre-existing 1985 contract with HUD.

Between September 10, 1986 and March 3, 1987, Green Management and HUD corresponded frequently about disputes concerning Green Management's AMB obligations in Wyoming. Among the disputes, plaintiff objected to HUD's position that Green Management had to obtain contractors for certain of the tasks specified in Section C(4) of the contract. On December 16, 1986, Mr. Porter, the Contracting Officer, sent Mr. Green an unexecuted document entitled "Memorandum of Negotiation." This document, a copy of which was appended to the parties' joint stipulation of facts, provides in pertinent part:

RE: Memorandum of Negotiation [4]

Mr. Green when he signed the Memorandum of Negotiation on January 1, 1987, and refer to a

---

4. Handwritten notes were placed in the margin next to paragraphs Ib, IV and VI, apparently by

In addition to the requirements set forth in Solicitation Number 101–86–079 and the proposal with supplements submitted to the U.S. Department of Housing and Urban Development (HUD) by Green Management Corporation, the items specified below are made part of the final negotiated agreement.

I. The price accepted for services under this Contract is a firm fixed price per property per month and reimbursed as follows:

a. Management Fee—$46.00 per property per month.

b. Reimbursables are to be paid at actual costs incurred and as authorized by the Government.

c. The Contracting Officer shall review the documentation submitted by Green Management Corporation in regard to the increase of wage rates given by the U.S. Department of Labor (DOL) to allow for an increase in the per property per month rates. A final rate shall be issued to Green Management Corporation based upon how much is directly related to DOL's wage increase.

II. The Contractor and the Government will meet at the end of the initial two years under this contract if the Government exercises its option for renewal.

The cost of these option years will be based on negotiations. The Contractor's cost history during the first 2–years, as determined by the performance and financial audits, required by this Contract, will be the primary basis for establishing the costs to be negotiated under this Contract for any renewal option exercised by the Government.

III. The Contractor will clear the unresolved and questioned costs as identified in the Office of Inspector General's initial

Pre-award Audit Report issued September 18, 1986. Clearance of these findings must be approved by the Government.

IV. The Contractor shall list in any areas which has a Multiple Listing Service (MLS) all HUD properties as designated to be listed by the Government. Reimbursement shall be at actual costs for placement and removal in any MLS service. Documentation shall be presented to HUD prior to any placement in MLS on where and costs involved.

V. The Contractor will submit all utility bills to HUD for payment after reviewing for duplicate payments and improper billings by the utility company. [Added: GMC has since been instructed to send bills direct to HUD.] [5]

VI. The Contractor shall contract out for all repairs and services requested by the Government on HUD acquired properties, except for Management Services (inspections) of HUD acquired properties, unless otherwise directed by the Contracting Officer. Authorization may be given orally, with written authorization to be issued within 72 hours after the verbal order was issued.

The document also bears the handwritten notations of Mr. Green, that specify objections which were set forth in a letter dated December 31, 1986. The December 31, 1986 letter from Mr. Green to Mr. Porter, the HUD Contracting Officer, discusses in detail the substance of the objections raised by the plaintiff with respect to paragraphs Ib, IV and VI of the December 16, 1986 Memorandum of Negotiation:

As per one of our many conversations on December 30, 1986 at 14:52 concerning the new contract; Green Management Corporation has been put in a precarious business position by HUD. We used Solicita-

December 31, 1986 letter of objection. Paragraph V, however, is supplemented with a handwritten notation at the end of the section stating: "GMC has since been instructed to send bills direct to HUD." Although the Memorandum is signed by Gary Green, he also explicitly stated at the end of the document: "[t]his memorandum is signed noting the above exceptions." This statement is followed by Mr. Green's initials and the date "1/27/87."

5. The bracketed sentence was added to the Memorandum of Negotiation, apparently by Mr. Green when he later signed the Memorandum of Negotiation on January 1, 1987. Throughout this opinion, handwritten additions in quoted documents are designated by "[Added: _____.]" and deleted portions of text are designated by "[Deleted: _____.]."

tion # 101–86–079 to bid this contract and find the Memorandum of Negotiation dated December 16, 1986 not a true understanding of our negotiations.

Section I.(b.) Reimbursables are to be paid at actual costs incurred and as authorized by the government:

This was not discussed with us. We bid the entire State of Wyoming using a flat rate per house with the understanding that Green Management Corporation would be allowed to sub-contract inspections and/or any other work that our company would be performing. We must be afforded the opportunity to make a profit by being allowed to charge our bid price regardless of the amount we pay to subcontractors. Our company is in business to make money and were we allowed to only charge off the actual expense of any employee or subcontractor we would lose money. Handling the paperwork is costly and time consuming. We bid the contract with normal inspections, paperwork and processing in mind.

Section IV Properties entered into Multiple Listing Service (MLS). No discussion was made at any time concerning the use of MLS. We will be happy to enter homes into MLS, however, our costs and time will be in excess of our bid price. I agree that HUD would see great sale advantages upon entry of HUD properties into the MLS. I believe the benefits would be a much greater exposure of HUD homes for sale, thereby, a much greater sale rate on HUD homes.

Our costs and labor in Campbell County would be as follows:

Our costs and labor in Campbell County would be as follows:

| | | | |
|---|---|---|---|
| 1. | Filling out MLS forms | 1.0 | hour |
| 2. | Taking pictures for MLS | .5 | |
| 3. | Submitting forms for publication to include travel | .5 | |
| 4. | Submitting forms to remove from MLS | .5 | |
| | | 2.5 | hours |

We will charge the cost each Realtor's Group charges for membership and house listing, plus a flat rate per house of thirty-five dollars ($35.00) for our time and expenses. We believe the benefit to HUD will be in the thousands of dollars per property. Thirty-five dollars ($35.00) will be the type of return on investment that will benefit HUD greatly and show wise management by HUD officials.

Section VI We were informed that we would be required to renegotiate all maintenance prices upon securing the new statewide contract.

Our bidding was directed toward performing both the inspections and maintenance and repair to property in a like manner to our performance on previous HUD contracts.

Solicitation # 101–86–079, # 4, Specific Requirements states that the contractor (GMC) may perform with their own personnel-winterizing, cleaning and trash removal, securing, yard maintenance and snow removal. On past contracts Green Management Corporation has performed all facets of maintenance for HUD. During initial inspections HUD has benefited both in price and time of performance by having the basic services performed at the time of initial inspection. Initial services are door knob change, inspection of unit, clean unit, haul trash, plumbing repair, systems checks, winterization and lawn care or snow removal.

We would appreciate your careful consideration to the above.

On December 31, 1986, Mr. Green also wrote another letter to Mr. Porter, this time emphasizing the importance to the viability of Green Management Corporation that Green Management provide the maintenance and repair services.

As per our phone conversation on December 30, 1986 at 14:30, I feel that HUD is putting Green Management Corporation in an unfair position with other private enterprise work. In past years we have performed all facets of maintenance and repair for mortgage company's and banks. Upon contracting with HUD we were forced to eliminate a large portion of our business when we were barred by HUD from working on properties being conveyed to HUD.

The economy has worsened and many of our past clients have lost their properties.

Green Management Corporation needs to continue to provide our large maintenance staff work and one area is the mortgage market.

We are continually being requested to perform plumbing repair, winterizations, sheet rock repair, housecleaning, etc.

We are requesting that HUD allow us this avenue of work. We will be more than happy to provide HUD declaratory statements of work performed on any home that becomes a conveyance to HUD. The advantage to HUD is one of significant savings of money. Green Management Corporation will warrant all work performed. At the present we often winterize HUD homes because the mortgage contractor did not complete the job correctly. On one home alone this would save HUD $85.00.

Please review carefully HUD's policy of monopolistic control over us the contractor. HUD has placed us in an unfair job position jeopardizing our future in the private sector.

Please answer us immediately.

In response, on January 9, 1987, Mr. Porter wrote to Mr. Green:

This is in response to your letter, dated December 31, 1986, in regard to your request for the U.S. Department of Housing and Urban Development (HUD) to allow you to perform maintenance services for Mortgagees on properties in Wyoming.

This is to advise you that HUD has denied your request to perform maintenance services on FHA insured properties. However, you may perform such services for Mortgagees on VA and/or Conventional held loans.

This denial is in accordance with Section H6a3–Conflict of Interest, of your Area Management Broker Contract, number 109–86–014 dated September 10, 1986 with HUD.

If there are any questions, please contact Mr. George Geiser, Supervisory Contract Specialist or myself at (303) 844–4116.

Accordingly, on January 14, 1987, Mr. Green wrote to George Geiser, Chief, Contracting Branch, in HUD's Denver, Colorado Regional Office. The letter attached to the parties' joint stipulation of facts provides in pertinent part:

As per our phone conversation on 1/14/87 at 11:30: As I indicated, I talked to Mr. Tom Roberts and Mr. Roy Porter last week concerning the properties presently in inventory that need systems checks and winterizing. Roy felt that the present prices received from contractors was too high and that we needed to increase our bidders's list. As per Roy's advice while we were attending HUD's AMS school, GMC was to submit an ad to Contracting to be dispensed through your Advertising Agency to all of the newspapers in Wyoming. This ad would be "Help Wanted" electricians, plumbers, etc. We submitted this ad in either late November or early December. I have checked with Contracting several times and to date they have been too busy to give it to the "Advertising Agency". Had this ad been put in the paper we should have had all of the bidders we would ever need.

Roy has since instructed me to put an ad in the Casper paper for contractors to perform required services. We are presently advertising and the response from unemployed individuals has been very good, however, we have not had a very good response from responsive responsible "contractors".

I will keep you advised prior to proceeding once we have received all of the bidders SF1 29's and prices.

Also, as per our conversation; I have sent letters describing our method of procurement, responses to that procurement and the prices we received. HUD wants qualified Contractors and they should have them, however, they must also expect to pay them a fair wage. They are required to maintain payroll records and pay wages that meet minimums described under the services and Davis Bacon Act. A responsible contractor must also have insurance. As I informed you, Mr. Roberts requested that I hire contractors without insurance to keep the bid prices down. My company

cannot afford to be put in a libelous situation of that nature.

I have sent you letters pointing out the fact that we bid according to the solicitation sent to us and under 4. Specific Requirements, we expected (considering our prices were competitive) to be performing standard services for HUD.

As per your statement; I realize that you may fall under some criticism for using our services, but from you own experience in the state of Wyoming, having outside contractors does not necessarily solve the problem.

Casper and many other areas in the past were serviced through AMB's by outside contractors only. Upon review by your personnel and Mr. Endres, the properties were found to be improperly winterized, systems check's incomplete, filthy, yards full of trash and grass reaching as high as four (4) feet. Reviews by your Realty Specialist's to include Mr. Joe Weyer and Ms. Justina Walls have given Green Management in Northeast Wyoming very favorable reviews.

Mr. John Endres did nothing but criticize AMB's in the school that we attended. I do not say that critically, *I agree with him!* Mr. Endres has been very unhappy with the overall performance of your AMB's. We plan to change his opinion by performing in a superior manner. Our reports, comparibles [sic] and the properties themselves will show you have hired the right contractor for the job, however, we need your help to provide you the services HUD needs performed. We cannot operate efficiently nor effectively with our hands tied.

On January 16, 1987, Mr. Green also wrote to Justina Walls, Chief, Property Sales Section, HUD's Denver, Colorado Regional Office. This letter reflects a meeting between Mr. Green and Ms. Walls and further expresses Mr. Green's continued frustration with the 1986 contract:

Thank you for taking time out of your busy schedule to visit with me on January 15, 1987 at 11:12 a.m. about frustrations I am encountering concerning our present contract. I have enclosed copies of letters to your subordinates concerning those frustrations. I have been hesitant to write letters to these individuals or visit with you about these problems. I feel that a strong possibility exists that by pointing out these problems our company may suffer retributions from it. I hope that does not happen, I only want the opportunity to perform under a fair set of rules.

We are still operating under a verbal contract (see letter dated 12/22/86 to Roy).

On December 31, 1986 I sent a letter (see letter to Roy dated 12/31/86), to Roy concerning our negotiations. My main concern is Green Management Corporation (GMC) not being able to perform any of the standard maintenance items listed under, 4. Specific Requirements—See the Solicitation. The other concerns are listed in the letter. We are, however, allowed to perform emergency repairs to occupied units after 16:00 until 8:00. This is a time frame when most other contractors are not interested in leaving their homes for work at night. Green Management on the other hand is not allowed to work normal hours but we are given permission to work during late night hours. GMC is being subjected to unfair work conditions using these rules.

On December 30, 1986, I sent Roy and Tom copies of our procurement attempts for their review (see letter to Roy dated 12/30/86). I felt the prices we were getting were too high and prior to release they requested a copy of our notes. The Gillette area was the only location contractors bid prices we felt HUD would be willing to pay. Even then with standard prices bid to HUD lower than any other contractors, (which we have been using for two years), we were not permitted to perform standard services. Not only were we the lowest bidder for HUD in Gillette, but our prices included the other areas bid by contractors and we were *substantially* lower in those areas.

Hopefully, HUD has some amount of trust in our company. They have the contractor's names and copies of our notes; surely they could call and verify from those contractors their prices from our

notes to see if we are using proper procurement methods. We bid the contract with two (2) required inspections and other inspections for repairs to properties that have been performed. We have been inspecting repairs and snow removal at no additional charge to HUD. However, we are being told by Mr. Roberts and Mr. Porter that we are not allowed to charge a service call whenever we make any other additional trips to properties. A vandalized unit, a unit left open or requests from Realty Specialists are extra trips beyond the scope of the contract. Mr. Roberts is requesting we count these trips as inspections. We feel this again is unfair treatment.

I have requested work in the past from Ms. Cissy Ross which in the past was standard (see letter to Cissy dated 1/7/87 and 1/8/87). Instead of replacing broken windows, we boarded. Instead of repairing broken pipes we left the homes "as is". Ms. Ross, I believe or I have felt, has been trying to make our contract difficult to perform under. She has slammed the phone down on me when she has gotten angry and informed me that she did not know if she worked for me or for HUD. Once Ms. Ross was sure we were not being allowed to perform maintenance she begin [sic] sending authorizations to perform work without a request from us. I have also informed her of our company not receiving property status reports. I informed her that the last status report we received was on 11/17/86. I informed that it was very difficult to maintain accurate records if we did not receive the status reports.

On January 27, 1987, Mr. Green signed the December 16, 1986 document entitled "Memorandum of Negotiation." As indicated above, however, immediately adjacent to his signature, Mr. Green wrote: "[t]his memorandum is signed noting the above exceptions." [6] Furthermore, also on January 27, 1987, Mr. Green sent a handwritten "Rapid Reply Letter" to the Contracting Officer. In this document, among other issues raised,

Mr. Green reiterated his request that Green Management be allowed to perform "standard services." The letter provides in relevant part:

> Please be advised as per our conversation: We are having difficulty finding contractors able to perform in rural areas, i.e. Hanna, Newcastle, etc. We are once again requesting that Green Mgt. Corp. be allowed to perform standard services.

Thereafter, on March 3, 1987, representatives of Green Management and HUD met at the HUD offices in Denver, Colorado. Several HUD representatives, including Roy Porter, the Contracting Officer, and George Geiser, the Chief of the Contracting Branch, attended the meeting. In attendance on behalf of Green Management were, among others, Gerald Green, Joel Kurtenbach, Green Management's accountant, and Mr. Shimberg, counsel to Green Management. The representatives from HUD brought the earlier circulated December 16, 1986 Memorandum of Negotiation (without the handwritten changes) to the meeting. The document, with handwritten additions initialed by both Mr. Green and Mr. Porter indicated in brackets, provides in pertinent part:

> In addition to the requirements set forth in Solicitation Number 101–86–079 and the proposal with supplements submitted to the U.S. Department of Housing and Urban Development (HUD) by Green Management Corporation, the items specified below are made part of the final negotiated agreement and the Area Management Broker Contract 109–86–014.

> I. The price accepted for services under this Contract is a firm fixed price per property per month and reimbursed as follows:

> a. Management Fee—$46.00 per property per month.

> b. Reimbursable are to be paid at actual costs incurred [Added: by HUD Contractors, as authorized by the government, as well as subcontractors of Green

---

**6.** These same objections are addressed above in the discussion of the letter dated December 31,

1986 to Roy Porter, the Contracting Officer.

Management Corp.] and as authorized by the Government.

c. The Contracting Officer shall review the documentation submitted by Green Management Corporation in regard to the increase of wage rates given by the U.S. Department of Labor (DOL) to allow for an increase in the per property per month rates. A final rate shall be issued to Green Management Corporation based upon how much is directly related to DOL's wage increase.

II. The Contractor and the Government will meet at the end of the initial 2 years under this contract if the Government exercises its option for renewal.

The cost of these option years will be based on negotiations. The Contractor's cost history during the first 2 years, as determined by the performance and financial audits, required by this Contract, will be the primary basis for establishing the costs to be negotiated under this Contract for any renewal option exercised by the Government.

III. The Contractor will clear the unresolved and questioned costs as identified in the Office of Inspector General's initial Pre-award Audit Report issued September 18, 1986. Clearance of these findings must be approved by the Government.

IV. The Contractor shall list in any area which has a Multiple Listing Service (MLS) all HUD properties as designated to be listed by the Government. A negotiated amount for the cost thereof shall be determined by the parties.

V. The Contractor will submit all utility bills to HUD for payment. [Added: And all tax notices on HUD owned property.]

VI. The Contractor shall contract out for all repairs and services requested by the Government on HUD acquired properties, except for Management Services (inspections) of HUD acquired properties, unless otherwise directed by the Contracting Officer. Authorization may be given orally, with written authorization to be issued within 72 hours after the verbal order was issued. [Added: As modified by "Memorandum of Understanding" executed by the undersigned on March 3, 1987.]

In addition to the above memorandum, a second typed draft document was circulated at the March 3, 1987 meeting. This document, titled "Memorandum of Understanding," and referenced at the end of the Memorandum of Negotiation, was also subject to handwritten additions initialed by both Mr. Green and Mr. Porter, and provides in pertinent part:

## MEMORANDUM OF UNDERSTANDING

Between U.S. Department of Housing and Urban Development and Green Management Corporation (Green)
Regarding Area Management Broker Contract 109–86–014

The U.S. Department of Housing and Urban Development (HUD) shall issue Termination for the Convenience (T for C) of the Government letters on March 1, 1987, to the following areas:

| | | | |
|---|---|---|---|
| 1. | Laramie, WY | 8. | Wheatland, WY |
| 2. | Riverton, WY | 9. | Cody, WY |
| 3. | Lander, WY | 10. | Powell, WY |
| 4. | Shoshoni, WY | 11. | Evanston, WY |
| 5. | Jeffrey City, WY | 12. | Rock Springs, WY |
| 6. | Jackson, WY | 13. | Green River, WY |
| 7. | Cheyenne, WY | 14. | Afton, WY |

The above letters will instruct the current Area Management Brokers (AMB) to turn over all files pertaining to HUD's acquired property program to Green by April 1, 1987. [Added: Grace period ends 5/1/87 .... will be performed within 10 days.]

HUD shall require Green to prepare and submit to this office a subcontracting plan to perform the services necessary for Green to perform under the AMB Contract 109–86–014.

Subcontracting is hereby defined as:

Any agreement (other than one involving an employer-employee relationship) entered into by Green (herein referred to as prime contractor) or subcontractor calling

for supplies or services required for performance of the contract or subcontract.

Green shall include the following items in their subcontract plan:

1. Goals in the use of small businesses and small disadvantaged businesses.

2. A statement detailing the total dollars planned to be subcontracted and the total dollars to be subcontracted to:

 a. Small businesses; and

 b. Small disadvantaged businesses

 c. Woman owned businesses (small business)

3. A description of the principal types of supplies and services to be subcontracted and identify types to be subcontracted to:

 a. Small businesses; and

 b. Small disadvantaged businesses

 c. Woman owned businesses (small business)

4. A description of the methods to be used to develop subcontract goals.

5. A description of the methods for obtaining and identifying potential sources.

6. The name of the individual employed by Green to administer their subcontract program.

7. A description of the efforts by Green to assure equitable opportunity for potential sources to compete for subcontracts.

8. Green must assure to:

 a. Include clause 52.219–9 (Small Businesses and Small Disadvantaged Business Subcontracting Plan).

 b. Organizations contacted in an attempt to locate small and small disadvantaged businesses.

 c. Record and maintain any outreach efforts.

 d. On a contract-by-contract basis, maintain records to support award and date submitted by contractor to the Government, including name, address and business size of each subcontractor.

NOTE: Failure of Green or any subcontractor to comply in good faith with this subcontracting plan and clause 52.219–9 shall be a material breach of Green Management Contract 109–86–014.

Milestones for Green Management Corporation shall be as follows:

[Added: March 3, 1987] Meet with Green to discuss issues.
[Deleted: February 27, 1987]

[Added: March 20, 1987] Submit prepared subcontracting plan to
[Deleted: March 16, 1987] HUD for review and approval or rejection.

[Added: Specifications to be mailed by March 13, 1987 by Roy Porter.]

[Added: March 27, 1987] HUD to give approval or rejection of
[Deleted: March 18, 1987] Green subcontracting plan in writing.

[Added: April 1, [19]87] If HUD gives approval, Green is to begin
[Deleted: March 20, 1987] implementation of the subcontracting plan.

[Added: May 1, [19]87] Green is to complete implementation of
[Deleted: April 20, 1987] their subcontracting plan.

---

Green shall be responsible for changing locks and re-keying the same on all HUD owned properties. In addition, where there are not existing subcontracts in place and until the subcontracting plan shall be fully implemented on [Added: May 1, 1987] [Deleted: March 20, 1987], Green shall perform winterization, house cleaning and snow removal services at reasonable

fees to be negotiated by the parties. [Added: Includes systems checks on FHA insured saleable property.]

| | |
|---|---|
| Green Management Corporation | U.S. Department of Housing and Urban Development |
| [signed] | [signed] |
| Gary Green—President | U.S. Department of Housing and Urban Development |
| Date: [Added: 3/3/87] | Date: [Added: March 3, 1987] |

---

[Added: HUD will give Green Management Corp. direction on any pass through of wages by the Department of Labor for employees actually hired & in place by Green Management Corp. by April 1, 1987.]

During the March 3, 1987 meeting, HUD gave Mr. Green and his staff time to confer privately with Green Management's counsel. After the private conference with counsel, handwritten revisions, as reflected above, were made to both draft proposals and were initialed by Mr. Porter and Mr. Green. After the parties made several written annotations to the Memorandum of Understanding, Mr. Green and Mr. Porter signed the document on March 3, 1987. Following the execution of the March 3, 1987 memoranda, Green Management continued performance on Contract No. 109–86–014, and did not reserve a material breach claim.

Green Management, however, did seek additional compensation from HUD through letters sent in late 1986 through March 1987, for specific services it performed on its AMB contract that Green Management believed were not within the terms of its contract. Among these were expenses associated with the use of 35mm film rather than polaroids to photograph properties, including $200.00 each for the cameras and $56.00 for processing expenses. Green Management further requested an increase from $100.00 to $400.00 for telephone expenses, additional compensation for redesigning computer files associated with the rezoning of Casper, and extra travel expenses for employee escorts for HUD inspectors. Green Management

also appealed a denial for invoices submitted in connection with classroom training.

It was not until July 6, 1990 that, pursuant to the Contract Disputes Act, Green Management filed three claims with the HUD contracting officer. In the first claim, Green Management alleged that HUD wrongfully terminated the 1986 contract for the convenience of the government. By letter dated November 22, 1989, Green Management had previously sought compensation for its close out costs associated with the 1986 contract. Contracting Officer Fran Beckham rejected Green Management's proposal on January 18, 1990, stating that on December 1, 1986, Green Management began performance and subsequently the one year contract was extended for two years. The Contracting Officer concluded that since the contract was not further extended, it expired under its own terms on November 30, 1988. In the second claim, Green Management alleged that HUD wrongfully terminated for default Contract No. 109–89–005, the 1988 contract.

In a third claim, submitted for the first time on July 6, 1990, with certified claims relative to the other two claims, Green Management alleges that as a result of the requirement that Green Management contract out tasks enumerated under Section C(4) of the 1986 contract, entitled "Specific Requirements," and by not permitting Green Management to perform such tasks itself, Green Management was entitled to breach of contract damages for a cardinal change or, in the alternative, an equitable adjustment for a

change to the contract. All three claims were denied by the HUD contracting officer.

On December 1, 1988, Green Management and HUD entered into Contract No. 109–89–005 (the 1988 contract). The 1988 contract, like the 1986 contract, was for AMB services, this time within geographic area VI in Wyoming, which comprised seven of Wyoming's 23 counties and contained approximately 78 HUD-owned properties at the time of the solicitation.[7] Following delivery of the property into the custody of HUD and assignment to Green Management, plaintiff was required, pursuant to Section C(3) of the contract, to prepare initial inspection reports and "workups" within ten days for submission to HUD. This included "initial work-ups" by which Green Management would prepare and submit a form showing what work needed to be done on the property; property listing reports with photographs of comparable properties; notification to subcontractors of work that needed to be performed on the properties; and initial inspection reports in order to get the properties on the market in a timely manner.

On February 10, 1989, HUD Contracting Officer John Parker, on behalf of George Geiser, Chief of the HUD Contracting Branch, sent a cure letter to Green Management because of alleged deficiencies in contract performance noted by HUD. The letter provided:

> The Contracting Branch has been notified by the Property Disposition Branch that there has been a delay in receipt of systems checks (which are to be included as part of the initial work-up) as directed by section C.3.a.(3) of your Area Management Broker Contract No. 109–89–005.
>
> A review of initial workups received by the U.S. Department of Housing and Urban Development (HUD) indicates that a fair percentage have been received without the requisite systems checks and after the 10–day time limit established for such in your contract. HUD cannot adequately list properties for sale without these documents being completed in a timely and accurate manner. Since Headquarters has placed special emphasis on the sale of

HUD-acquired properties as quickly as possible, we cannot tolerate delays in this process.

> This letter is your notice to cure the above deficiencies. Accordingly, you are afforded the opportunity to present in writing procedures you plan to implement to correct the aforementioned deficiencies to the Contracting Officer within ten (10) days after receipt of this letter. Your failure to present a satisfactory solution to HUD within this time period may be considered an admission that none exists, and your contract may be terminated for default in accordance with FAR Clause 52.249–8.

In response, Green Management sent a letter dated February 13, 1989 to Mr. Geiser, which stated:

> I am in receipt of your "cure letter" dated February 10, 1989. We notified the Pre Sales Team that seven files in Northwest Wyoming were incomplete of outside contractor systems checks and winterizations. Green Management Corporation (GMC), assigned the work to contractors, however, they had not performed in a timely manner. Both Fremont Plumbing and City Plumbing have been terminated for nonperformance of those checks.
>
> As per your letter, the contract requires that all data including systems checks and winterizations be included in the initial submission. We realize that requirement, however, contractors are beyond our direct control other than assignment of work. Once those contractors did not perform they were terminated and new contractors were solicited and hired. In the interim GMC submitted work directly performed by our personnel in a timely manner.
>
> On February 3, 1989 GMC once again wrote a letter (enclosed) to the Pre Sales Team along with those documents from contractors, missing from initial inspections, completing those files.
>
> At this time, the new contractors we have hired are responsive and providing the services in a timely manner. Unless those contractors fail to respond in the

---

7. Wyoming was divided into seven areas for purposes of AMB contracts in December 1988.

future no further delays on contractor work should delay complete files in your office. GMC will continue to perform our work in a timely manner including assignment of outside contractors to perform system checks.

I apologize for this past delay, however, those delays were beyond GMC's control. If contracting has other available contractors in Northwest Wyoming we would certainly be grateful for a copy of your list. Past advertising has failed to provide contractors from most of the small towns in this portion of Wyoming.

All files under our contract were complete by February 3, 1989. We do not expect our present contractors to delay systems checks in the future.

On March 2, 1989, HUD again wrote to Green Management and provided an extensive list of properties for which Green Management had failed to provide information:

The following properties were assigned to Green Management Corporation (GMC) under the terms of the old Area Management Broker contract. However, the workups,on these properties are still incomplete. As you were awarded contract number 109–89–005 for the area encompassing these properties on December 1, 1988, we expect you to provide the information requested not later than ten days from receipt of this letter.

 \* \* \* \* \* \*

[List of properties, case numbers, date assigned workups received and four pages of missing items.]

Although the above information was required under the previous contract you are requested to complete and/or promise all of the above information to this office by the required timeframe or we will forward this information to the Contracting Officer and request a notice to cure.

Thereafter, HUD issued Green Management a Show Cause Notice from Mr. Geiser, dated May 8, 1989 that provides in pertinent part:

Since you have failed to cure the conditions endangering performance under Contract No. 109–89–005 as described to you in the Government's letter of February 10, 1989, and March 2, 1989, the Government is considering terminating the contract under the provisions for default of this contract. Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose from causes beyond your control and without fault or negligence on your part. Accordingly, you are given the opportunity to present, in writing, any facts bearing on the question to [the Contracting Officer].

Facts bearing on the question must be presented within ten (10) days after receipt of this notice. Your failure to present any excuses within this time may be considered as an admission that none exists. Your attention is invited to the respective rights of the contractor and the Government and the liabilities that may be invoked if a decision is made to terminate for default.

Any assistance given to you on this contract or any acceptance by the Government of delinquent services will be solely for the purpose of mitigating damages, and it is not the intention of the Government to condone any delinquency or to waive any rights the Government has under this contract.

Green Management responded to the HUD Show Cause Notice in a letter dated May 11, 1989:

I am in receipt of your "Show Cause" letter dated 5/8/89. All of the conditions listed in the letter of 2/10/89 and 3/2/89 were "cured" and the 3/20/89 letter listed each property and provided whatever information was requested. I "Mail Expressed" the 3/20/89 letter and answers to you yesterday. I am providing this letter with copies of any information that was pending during the writing of the 3/20/89 letter that was shipped at a later date.

In the 2/10/89 letter from you, a "cure notice" was given to Green Management Corporation (GMC) for outside contractors not performing system checks in a timely manner. We terminated those contractors not performing and hired more. We fired some of those new hires and again hired more new contractors. *We also requested*

*a list of bidders from your files to assist us in filling the needed contractor positions because our advertising had not provided an adequate supply to us.* We never received and [sic] answer or a list of those contractors from you.

We enclosed a copy of a letter from Mr. Glen Parker to the Presales Team shipped 2/3/89 providing the missing systems checks which were a complaint in your letter of 2/10/89. In my answer of 2/13/89, I addressed the issues of your letter and showed a "cure" by hiring other contractors, explaining that those would be terminated should they not perform timely; which has since been done.

On 3/2/89 a letter from Ms. Joyce Jacoby was sent to our office signed by Gallya S. Dya. This letter was received by us 3/8/89. All files were reviewed and Ms. Jacoby was called on 3/9/89. Most of the documents she was requesting had been previously submitted and were in our files. She was informed that all system checks listed by her and all other deficiencies had been ordered if it was necessary, with new contractors, and that we would wait for their systems check submissions prior to answering her letter if that would be permissable [sic]. She informed Mr. Bill Skinner that she would make a note of his call and put it in the file and await his letter. The submission was sent certified and received by the U.S. Department of Housing and Urban Development (HUD) on 3/27/89. That submission was made on 3/20/89 which I sent to you yesterday (5/10/89) for your perusal. I have enclosed copies of the following items which were sent after 3/20/89 to the property sales teams completing all notices required to cure.

Upon your review you will find that all notices were cured and that we are trying very hard to provide you people with timely and accurate information. During Ms.

Mingus' and Mr. Bahrs' inspection of our records, files were found orderly and all files were complete. Ms. Mingus' report to us was compilmentary [sic] of our work.

\*　　\*　　\*　　\*　　\*　　\*

All deficiencies were cured as requested and copies of those items are attached. We will forward copies of these or other documents to the Realty Specialist if they do not have them. I realize that all documents do not always end up with the right people when shipped to your office. Even registered "Federal Express" does not always find its' [sic] way to the right people as was recently discovered with our lawn bid.

(Emphasis in original.)

Finally, HUD Contracting Officer John Parker issued a Notice of Termination to Green Management on May 24, 1989. On June 2, 1989, an amended Notice of Termination was issued, clarifying certain provisions, deleting others, and providing appeal rights.[8]

The Amended Notice of Termination to Prime Contractor reads:

1. This is in regard to your Area Management Broker (AMB) Contract Number 109–89–005 with the U.S. Department of Housing and Urban Development (HUD) for Are a VI in the State of Wyoming.
2. Effective May 24, 1989, HUD is terminating completely your AMB Contract Number 109–89–005 (herein referred to as "The Contract") dated December 1, 1988, for default under clause entitled SUBPART 49.4 Termination for Default and Clause 52.249.8 Default (Fixed–Price Supply and Service). You have defaulted your contract by your failure to perform services within the specified time. After receipt of HUD Form–27011 by the contractor, complete initial workups are not provided to HUD within the ten day time limit established in the contract (receipt of

---

**8.** Attached as a cover sheet to the June 2, 1989 amended notice was a letter to Mr. Green from Mr. Geiser which noted:

Because of concerns about the clarity of the May 24th Notice we are amending that Notice as per the enclosure attached to this letter. In the enclosed Notice, we have clarified certain

provisions, added a statement of your appeal rights, and deleted unnecessary provisions. To the extent that provisions in the May 24th notice are inconsistent with the provisions of the enclosed Notice, the provisions in the May 24th notice should be disregarded.

work ups by HUD has been 30 days or more after contractor received the HUD Form 27011) and workups are seldom complete. HUD cannot adequately list properties for sale without timely submission of completed workups.

3. HUD will only pay for service performed by either you or your subcontractor prior to the termination date. Your firm should submit a request for payment for work performed during May prior to May 24, 1989 as soon as possible.

\* \* \* \* \* \*

5. The Contracting Officer has determined that the failure to perform is not excusable and information provided by the contractor in response to "Show Cause" letter of May 8, 1989, did not outline procedures you will take to correct the problem nor did you address what actions you would take to correct the problem nor did you address what actions you would take if this problem were to occur again. The Contractor refuses to comply with the contract terms and continued to submit incomplete workups or none at all. This Notice of termination constitutes the Contracting Officer's decision to terminate Contract Number 109–89–005 in its entirety for default and the Contractor has the right to appeal this decision under the Disputes Clause of the contract.

6. The Department of Housing and Urban Development reserves all rights and remedies provided by law or under the contract. We will proceed to have these services performed by others and you will be liable to the Government for any excess cost.

7. This notice constitutes a decision that the Contractor is in default as specified in item 2 above and the Contractor has the right to appeal under the Contract Disputes Act of 1979[sic] (42 U.S.C. 601–623)[sic] (The Act).

8. This is the final decision of the Contracting Officer. You may appeal this decision to the HUD Board of Contract Appeals (HBCA). If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the HBCA and provide a copy to the Contracting Officer. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number.

### DISCUSSION

Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ. P.) and is similar both in language and effect.[9] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment,

---

9. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Secretary of Dept. of Health & Human Services*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the nonmoving party cannot present evidence to support its case under any scenario, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Industrial Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmov-

ing party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

The fact that both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.,* 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.,* 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is

rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States,* 29 Fed.Cl. 318, 322 (1993), *aff'd,* 31 F.3d 1176 (Fed.Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States,* 812 F.2d at 1391.

In accordance with the standard of review articulated above, and after an examination of the submissions of the parties in the above-captioned case, the court finds that there are no material facts in dispute. The present dispute, therefore, is ripe for summary disposition.

The above-captioned case deals with two different contracts entered into by the plaintiff, Green Management Corporation and the defendant, the United States, acting through HUD. As outlined above, with regard to Contract No. 109–86–014 (the 1986 Contract), plaintiff has asserted the following claims: (1) breach of contract, based upon an alleged cardinal change to the 1986 contract; (2) or an equitable adjustment based on a within scope change to the 1986 contract; and (3) settlement costs based upon a termination of the 1986 contract for the convenience of the government. With regard to Contract No. 109–89–005 (the 1988 Contract), plaintiff seeks breach of contract damages and conversion of the defendant's alleged bad faith termination for default to a termination for the convenience of the government.

Beginning with Contract No. 109–86–014, in its complaint and motion for summary judgment, plaintiff contends that HUD's change, from permitting in-house performance of contract Section C(4) services to requiring that C(4) services be contracted out, constitutes a cardinal change to the contract resulting in a breach of that contract by the government. In response, defendant has invoked the defense of accord and satisfaction, contending that the Memorandum of Negotiation and the accompanying March 3, 1987 Memorandum of Understanding demonstrate that the parties entered into a valid bilateral modification, agreed to and signed by both parties. In the present case, there is no dispute between the parties that the 1986 contract was modified from the original signed contract. The first issue before the court is whether the change was a cardinal change, resulting in a breach of the contract by the government.

■ Parties may modify a government contract at any time, including after execution: "[t]hey may modify not only its substantive provisions but its prescribed procedures, including the procedures for the resolution of disputes." *General Dynamics Corp. v. United States,* 214 Ct.Cl. 607, 617, 558 F.2d 985 (1977). *See also Pinewood Realty Ltd. Partnership v. United States,* 223 Ct.Cl. 98, 105, 617 F.2d 211 (1980) (quoting *General Dynamics Corp. v. United States,* 214 Ct.Cl. at 617, 558 F.2d 985).

■ Despite the ability of a party to modify a contract, when a contract modification is found to be "drastic" and to alter the nature of the item contracted for, it is considered outside the scope of the contract and is denominated a "cardinal change," rendering the government in breach of the contract. *See Aragona Constr. Co. v. United States,* 165 Ct.Cl. 382, 391, 1964 WL 8634 (1964). The changes clause in the contract between the instant parties, "Changes—Fixed–Price (August 1987), Alternate I," 48 C.F.R. § 52.243–1 (1987), provides that the contracting officer may make changes within the general scope of the contract. This court's predecessor, the United States Court of Claims, set forth the standard for determining whether a given contract modification is so drastic as to be labeled a "cardinal change," beyond the general scope of the contract:

Under established case law, a cardinal change is a breach. It occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. By definition, then, a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach. *See, e.g., Edward R. Marden Corp. v. United States, supra,* 194 Ct.Cl. at 808, 442 F.2d at 369; *Air–A–*

*Plane Corp. v. United States, supra,* 187 Ct.Cl. at 275–76, 408 F.2d at 1033; *Keco Industries, Inc. v. United States,* 176 Ct. Cl. 983, 998–99, 364 F.2d 838, 847–48 (1966), *cert. denied,* 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105, (1967); *Aragona Construction Co. v. United States,* 165 Ct. Cl. 382, 390–91, 1964 WL 8634 (1964). In *Marden, supra,* we specifically stated that the purpose of the cardinal change doctrine is "to provide a breach remedy for contractors who are directed by the government to perform work which is not within the general scope of the contract." ... The doctrine is couched in terms which apply generally to modifications which are so fundamental that they cannot be redressed within the contract by an equitable adjustment to the contract price....

The existence of a cardinal change is principally a question of fact, requiring that each case be analyzed individually in light of the totality of circumstances. *See Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 194, 351 F.2d 956, 966 (1965); *Saddler v. United States,* 152 Ct.Cl. 557, 561, 287 F.2d 411, 413 (1961).

*Allied Materials & Equip. Co. v. United States,* 215 Ct.Cl. 406, 409–11, 569 F.2d 562 (1978). In determining whether or not there has been a cardinal change to the contract, the court must consider the totality of change or changes. "Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole." *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 194, 351 F.2d 956 (1965) (citing *Saddler v. United States,* 152 Ct.Cl. 557, 561, 287 F.2d 411 (1961)). *See also Amertex Enterprises, Ltd. v. United States,* No. 90–684C, 1995 WL 925961, at *59–61 (Fed.Cl. Dec. 15, 1995), *aff'd,* 108 F.3d 1392 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

Plaintiff's complaint asserts that the direction of the contracting officer to subcontract out all maintenance and repair work drastically altered the 1986 contract by requiring plaintiff to perform duties materially different from those originally contemplated.

The change is reflected in provision VI of the "Memorandum of Negotiation" which states as follows:

VI. The Contractor shall contract out for all repairs and services requested by the Government on HUD acquired properties, except for Management Services (inspections) of HUD acquired properties, unless otherwise directed by the Contracting Officer. Authorization may be given orally, with written authorization to be issued within 72 hours after the verbal order was issued. [Added: As modified by "Memorandum of Understanding" executed by the undersigned on March 3, 1987.]

■ One test for a cardinal change is whether the work remains "essentially the same work as the parties bargained for when the contract was awarded." *Aragona Constr. Co. v. United States,* 165 Ct.Cl. at 391; *see also Amertex Enter., Ltd. v. United States,* 1995 WL 925961, at *60. If the function or nature of the work, as changed, remains generally the same, the change or changes will be held to fall with the general scope of the contract. *See also Keco Indus., Inc. v. United States,* 176 Ct.Cl. 983, 997–99, 364 F.2d 838 (1966), *cert. denied,* 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967) (citing *Aragona Constr. Co. v. United States,* 165 Ct.Cl. at 391) (finding that change from one power system to another in refrigeration units is within scope since the units essentially remained the same). Among other tests for cardinal changes have been the degree of work disruption and increase in cost stemming from the change. Contractors have rarely been successful under this test. *See* John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 386 (3d ed.1995).

In the instant case, although the plaintiff asserted in its complaint that the contracting officer's direction to subcontract out all maintenance and repair work was a cardinal change, the parties did not devote much attention to the issue beyond conclusory statements in subsequent filings and briefs, choosing instead to focus on whether or not the parties had achieved accord and satisfaction on the issue in a bilateral modification, or whether the plaintiff had waived the issue.

Defendant argues that the Memorandum of Negotiation and accompanying Memorandum of Understanding executed the same day constituted a valid bilateral modification, and that plaintiff's cardinal change and equitable adjustment claims, therefore, were barred by the doctrine of accord and satisfaction. The defendant continues, "[b]y electing to perform on the –014 [the 1986] contract after the United States allegedly breached it, GMC waived any claim for a cardinal change or breach of contract damages, arising from HUD's requirement that GMC must subcontract the tasks enumerated under Section C(4) of the –014 contract." In support of its contention that the plaintiff's actions constitute a waiver of a material breach, defendant cites *Cities Serv. Helex, Inc. v. United States*, 211 Ct.Cl. 222, 236–41, 543 F.2d 1306 (1976) and *Government Sys. Advisors, Inc. v. United States*, 21 Cl.Ct. 400, 411 (1990), *vacated on other grounds*, 25 Cl.Ct. 554 (1990). These cases indicate that a plaintiff may waive its right to assert a breach of contract. "A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it." *Cities Serv. Helex, Inc. v. United States*, 211 Ct.Cl. at 234, 543 F.2d 1306; *see also Amertex Enter., Ltd. v. United States*, 1995 WL 925961 at *61 ("Notwithstanding the evidence supporting plaintiff's plausible and potentially convincing cardinal change assertion, plaintiff's position on this issue is fatally undercut by the bilateral modifications made to the delivery schedule in 1988. . . . Because of plaintiff's agreement to produce the modified suits, we find no cardinal change.").

Plaintiff alleges facts which it contends defeat defendant's characterization of the March 3, 1987 meeting and the execution of the Memorandum of Negotiation and accompanying Memorandum of Understanding as a bilateral modification and resulting accord and satisfaction. In particular, rather than a "negotiation," plaintiff characterizes the meeting at which Green Management signed the Memorandum of Negotiation and Memorandum of Understanding as reflecting HUD's unilateral decision to modify the 1986 contract and force Green Management to subcontract its maintenance services. Green Management alleges that the discussion at the meeting centered on HUD informing Gerald Green, President of Green Management, that if Green Management did not sign the above-mentioned documents, the 1986 contract would be terminated.

Because the defense of accord and satisfaction, if adequately supported, can be a complete bar to plaintiff's claim, the court turns to the issue of whether the Memorandum of Negotiation and the Memorandum of Understanding satisfy the requirements of an accord and satisfaction. "Accord and satisfaction denotes 'one of the recognized methods of discharging and terminating an existing right and constitutes a perfect defense in an action for the enforcement of a previous claim, whether that claim was well-founded or not.'" *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct.Cl. 101, 108, 654 F.2d 711 (1981) (quoting 6 Corbin on Contracts § 1276 (1962)); *Valcon II, Inc. v. United States*, 26 Cl.Ct. 393, 396 (1992). "An accord is an agreement by one party to give or perform and by the other party to accept, in settlement or satisfaction of an existing or matured claim, something other than that which is claimed to be due." *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct.Cl. at 108, 654 F.2d 711 (quoting 1 Am.Jur.2d Accord and Satisfaction § 1 (1962)); *Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 92 (1989). "As the term 'accord and satisfaction' indicates both an accord and satisfaction are necessary to bar a claim." *Robinson Contracting Co., Inc. v. United States*, 16 Cl.Ct. 676, 685 (1989), *aff'd*, 895 F.2d 1420 (Fed.Cir.1990). "Satisfaction means 'the evolution or performance of the agreement, or actual giving and taking of some agreed upon things.'" *Id.*

 The applicable precedent is clear that:

The essential elements of an effective accord and satisfaction are proper subject matter, competent parties, meeting of the minds of the parties, and consideration. And its most common pattern is a mutual agreement between the parties in which one pays or performs and the other ac-

cepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute....

*Brock & Blevins Co. v. United States,* 170 Ct.Cl. 52, 58–59, 343 F.2d 951 (1965) (quoting *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.,* 176 F.2d 73, 76 (10th Cir.1949), *cert. denied* 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581 (1950)). *See also Mil–Spec Contractors, Inc. v. United States,* 835 F.2d 865, 867 (Fed.Cir.1987); *Valcon II, Inc. v. United States,* 26 Cl.Ct. at 396; *King Fisher Marine Serv., Inc. v. United States,* 16 Cl.Ct. 231, 236 (1989). If the defendant fails to establish the existence of any of these basic elements, the defense fails.

It is undisputed by the parties that between September 10, 1986, and March 3, 1987, Green Management and HUD disagreed as to Green Management's AMB obligations in Wyoming pursuant to the 1986 contract. Indeed, from the date of the award of the 1986 contract until the March 3, 1987 execution of the Memorandum of Negotiation and Memorandum of Understanding, Green Management objected to HUD's position that it must obtain subcontractors for the tasks specified in Section C(4) of the contract as originally signed. During this time, the parties frequently corresponded and discussed various issues concerning Green Management's responsibilities under the 1986 contract. Thus, a bona fide dispute regarding the proper contractual obligations existed between the parties.

First, there must be proper subject matter under the accord and satisfaction doctrine, in other words, the subject matter of the complaint must be the same as the subject matter of the documents which modify the 1986 contract. *See King Fisher Marine Serv., Inc. v. United States,* 16 Cl.Ct. at 237. The relevant provisions of complaint number 91–1346C state as follows:

### FIRST CLAIM FOR RELIEF
### (Breach of Contract—Cardinal Change)

\* \* \* \* \* \*

21. The contracting officer's direction to subcontract out all maintenance and repair work drastically altered the 1986 Contract by requiring GMC to perform duties materially different from those originally contemplated.

22. GMC is entitled to an award of damages, including lost profits, as a result of the cardinal change to the 1986 Contract in an amount not less than $1,075,241.20. This amount includes but is not limited to: the expense of hiring additional employees in GMC's Casper and Gillette, Wyoming offices including file clerks, contracting officers, and maintenance personnel; additional office expenses including furniture, office supplies, office usage, paper products, postage, and telephone usage; the increased cost of the performance audit which GMC was required to undergo; and a reasonable profit on these amounts. This amount also includes a reasonable profit of 10% on all work performed under the 1986 Contract which GNC was prevented from performing in-house as a result of the Government's breach of contract.

WHEREFORE, GMC requests that the Court reverse the April 1, 1991, Final Decision of the Contracting Officer in this case, find that the Contracting Officer's action with respect to ordering GMC to subcontract all maintenance and repair work constituted a breach of contract, and award GMC damages, including, but not limited to lost profits, incurred as a result of the Government's breach. In addition, GMC requests an award of all costs and attorneys' fees that it has incurred in connection with this claim, and interest through the date of payment of its claim.

### SECOND CLAIM FOR RELIEF
### (Failure to Grant Equitable Adjustment for Contract Change)

\* \* \* \* \* \*

25. The Government's directive to subcontract all maintenance and repair work constitutes either a directed change or a constructive change to the 1986 Contract entitling GMC to an equitable adjustment of the 1986 Contract price.

26. GMC is entitled to an upward adjustment of the Contract price in an amount not less than $802,834.70. This amount

includes but is not limited to the expense of hiring additional employees in GMC's Casper and Gillette, Wyoming offices including filed clerks, contracting officers, and maintenance personnel; additional office expenses including furniture, office supplies, office usage, paper products, postage and telephone usage; the increased cost of the performance audit which GMC was required to undergo; and a reasonable profit on these amounts.

This complaint asserts cardinal change and equitable adjustment claims arising from the direction of the contracting officer, based on the requirement for Green Management to subcontract out all maintenance and repair work. The requirement that plaintiff contract out all repairs and services on HUD acquired properties is set forth in the Memorandum of Negotiation executed on March 3, 1987. Provision VI of that Memorandum of Negotiation states as follows:

> VI. The Contractor shall contract out for all repairs and services requested by the Government on HUD acquired properties, except for Management Services (inspections) of HUD acquired properties, unless otherwise directed by the Contracting Officer. Authorization may be given orally, with written authorization to be issued within 72 hours after the verbal order was issued. [Added: As modified by "Memorandum of Understanding" executed by the undersigned on March 3, 1987.]

The mechanics of the subcontracting requirements are defined in the Memorandum of Understanding referenced in the above provision. Because the subject matter of the documents defendant seeks to characterize as the relevant modification is the same as that set forth in the complaint, the court concludes that the subject matter element of an accord and satisfaction is satisfied.

This court also finds that both the plaintiff and the defendant in this action are competent parties, satisfying the second element of a proper accord and satisfaction defense. Neither party contests that the individuals executing the March 3, 1987 Memorandum of Negotiation and Memorandum of Understanding were competent parties. Indeed, it appears that the same individuals who exe-cuted the original contract, Mr. Porter, the Contracting Officer (who is considered competent pursuant to 48 C.F.R. § 43.102(a) (1987)), and Mr. Green, the President of Green Management, executed the March 3, 1987 documents. The court, therefore, concludes that both individuals executing the March 3, 1987 memoranda were competent.

As with any contract modification, a valid accord and satisfaction must be supported by consideration. *Brock & Blevins Co. v. United States,* 170 Ct.Cl. at 58, 343 F.2d 951 (quoting *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.,* 176 F.2d at 76); *Valcon II, Inc. v. United States,* 26 Cl.Ct. at 396; *King Fisher Marine Serv., Inc. v. United States,* 16 Cl.Ct. at 236. *See also Montefiore Hosp. Ass'n v. United States,* 5 Cl.Ct. 471, 476 (1984) (citing *Vulcanite Portland Cement Co. v. United States,* 74 Ct.Cl. 692, 705, 1931 WL 2351 (1932)). In *Brock & Blevins Co. v. United States,* the court noted that the most common pattern of accord and satisfaction is a mutual agreement in which one party pays or performs and the other accepts the payment or performance in satisfaction of a claim or demand which is a bona fide dispute. *Brock & Blevins Co. v. United States,* 170 Ct.Cl. at 59, 343 F.2d 951 (quoting from *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.,* 176 F.2d at 76).

Defendant, in its motion for summary judgment, asserts that plaintiff received several items of consideration: (1) HUD extended the initial term of the contract to two years, from the original one year term; (2) HUD agreed to reimburse Green Management for payments to subcontractors; (3) HUD agreed to pay an amount in addition to the $46.00 contract price, management fee for listing HUD properties on the Multiple Listing Service (MLS); (4) HUD agreed to pay all utility bills directly, and eliminated the requirement that Green Management review utility bills; and (5) the government forebore from terminating the contract for convenience.

Plaintiff, however, contends that these items were not intended as consideration for eliminating Green Management's discretion to perform the Section C(4) maintenance ser-

vices in-house. As to the first item of consideration listed above, extending the initial term of the contract, plaintiff "believed that, barring any major difficulties in contract performance, the 109–86–014 Contract would last four years." The original contract language states:

### SECTION F— DELIVERIES/PERFORMANCE

1. Term of Contract.

a. The contract shall commence on the date indicated on page 1 (Section A) of the contract and shall continue for a one 1–year period, or for a lesser period of time as specified on page 1 hereof, unless otherwise terminated as provided for in 48 CFR Part 49 of the Federal Acquisition Regulations.

b. Option to extend the term of the Contract—Services

(1) The Government may extend the term of this contract at its sole discretion for three 1–year periods by written notice to the Contractor.

(2) Such extensions shall require continued performance of services within the limits and at the rates stated in the contract.

(3) Notice of such extension will be furnished to the Contractor at least 90 days before the contract expires.

(4) The total duration of this contract, including the exercise of any option under this clause, shall not exceed 4 years.

The above-quoted provisions clearly indicate that, although Green Management was bound to make its services available to the government for the option years, HUD had the option, but not the obligation, to use those services beyond the first year. Plaintiff's belief that options would be exercised was merely hopeful, without certainty.

■ An option contract generally binds the option giver, not the option holder. As explained in *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 74, 389 F.2d 424 (1968), Professor Corbin described an option contract as follows:

the primary element of the option contract is that the option Holder has the legal power to consummate a second contract for the contemplated exchange of equivalents and at the same time the legal privilege of not exercising it. The option giver, on the other hand, has the correlative liability to become bound to execute that exchange, and at the same time a disability to avoid it.

1A Corbin, Contracts § 259 at 464 (1963 ed.).

■ The United States Claims Court, the predecessor court to the United States Court of Federal Claims, likewise stated:

The government's failure to exercise an option in a contract does not ordinarily give rise to a breach of contract action. A standard option provision in a government contract obliges the contractor to perform the additional contract work if the government chooses to exercise the option, but it does not create a legal obligation on the part of the government to exercise the option and require the work. *See Dynamics Corp. of Am. v. United States*, 182 Ct.Cl. 62, 74, 389 F.2d 424, 431 (1968); *Government Systems Advisors, Inc. v. United States*, 847 F.2d 811, 813 (Fed.Cir. 1988).

*Optimal Data Corp. v. United States*, 17 Cl.Ct. 723, 731 (1989), *aff'd*, 904 F.2d 45 (Fed.Cir.1990). The language in Section F(1)(b)(1) of the original contract that "[t]he government may extend the term of this contract at its discretion for three 1–year periods by written notice to the contractor" establishes that exercise of the option is at the government's discretion. Thus, the government at the time it entered into the contract modification was under no duty to extend the contract beyond one year, but Green Management was bound to perform during the option years if the government exercised its option to extend for one, two or three years.

Section II of the Memorandum of Negotiation executed by the parties on March 3, 1987 reflects a contract term modification from a one year to a two year initial performance period. Provision II of that Memorandum states as follows:

II. The Contractor and the Government will meet at the end of the *initial two years* under this contract if the Government exercises its option for renewal.

The cost of these option years will be based on negotiations. The Contractor's cost history *during the first 2 years,* as determined by the performance and financial audits, required by this Contract, will be the primary basis for establishing the costs to be negotiated under this Contract for any renewal option exercised by the Government.

(Emphasis added.) The modification of the contract to reflect a two year initial period, with subsequent options to renew, rather than a one year period with options to renew, alone constitutes valid consideration to support an accord and satisfaction. In this regard, it is a long-established rule that the court will inquire only into whether there has been a bargained-for exchange, and not into the adequacy of consideration. *See Silverman v. United States,* 230 Ct.Cl. 701, 711, 679 F.2d 865 (1982); *Mills v. United States,* 187 Ct.Cl. 696, 700–01, 410 F.2d 1255 (1969); *Florida Keys Aqueduct Auth. v. United States,* 7 Cl.Ct. 297, 299 (1985), *aff'd,* 790 F.2d 95 (Fed.Cir.1986) (Table).

In addition to the extension of the initial contract period, defendant proffers additional forms of consideration for review by the court. For example, HUD agreed to "reimburse GMC for its payments to ... GMC subcontractors who performed repairs and services." As the plaintiff points out, however, Green Management appears to be entitled to such reimbursement under Section H(1)(m) of the contract. Thus, such reimbursements would not constitute fresh consideration.

The plaintiff and HUD also agreed in the Memorandum of Negotiation executed March 3, 1987 that the plaintiff would list HUD properties in areas with a Multiple Listing Service (MLS) and that HUD would pay additional amounts for this service. The plaintiff argues that the agreement as to the MLS listing was a "discrete provision," and should not be viewed as consideration for any other requirement, including the requirement to subcontract maintenance services. In response, defendant argues that

GMC has not presented any evidence to show that all of the terms included in the "March 3, 1987 Modification" were separately negotiated. To the contrary, the Stipulated Facts and negotiation documents incorporated therein present overwhelming evidence that a number of contract terms were being considered and negotiated together between the months of December 1986 and March 1987, and that the modification was entered into as a whole.

The circulation of the draft Memorandum of Negotiation in December 1986 and January 1987; the frequent correspondence and discussions between contract award and March 3, 1987; the subsequent face-to-face negotiations between the parties on March 3, 1987; and the finalization of the Memorandum of Negotiation and accompanying Memorandum of Understanding on the same date, which enunciated the resolution of multiple issues, evidenced consideration from both parties and reflects that the agreement was entered into as a whole, resolving multiple issues. The Memoranda of Negotiation and Understanding were not a mere compilation of separate negotiations and agreements on individual matters. Thus, the agreement with respect to the MLS listings was part of the total consideration for the total agreement contained in the March 3, 1987 Memorandum of Negotiation and Memorandum of Understanding and signed to by both the plaintiff and the defendant.

The plaintiff also argued that no consideration was offered by HUD with respect to utility bills:

The solicitation always contemplated HUD payment of the utility bills, either directly or indirectly through GMC reimbursement. When the 109–86–014 Contract was awarded, HUD elected to pay the utility bills directly. After discussing this provision at the March 3, 1987 meeting, HUD elected to *continue* to pay the utility bills directly. GMC received no benefit from HUD's election to continue direct payment of utility bills. Thus, HUD's payment of utility bills cannot be deemed as consider-

ation for GMC's requirement to subcontract the § C(4) services.

(Citations omitted and emphasis in original.) Defendant, however, argues that after the 1986 contract was awarded, HUD proposed that the plaintiff submit utility bills to HUD for payment, but that the contractor review them first for improper billings. In fact, the draft Memorandum of Negotiation circulated in December and January 1987 did propose such a review, and the final Memorandum of Negotiation executed March 3, 1998 provided that the plaintiff could submit the utility bills directly to HUD without review. Though defendant argues that this would avoid a review of as many as 3,600 utility bills a month, defendant has not demonstrated that the plaintiff was initially required under the contract to review utility bills should HUD decide to pay such bills directly. At this point, all the record reflects is that defendant essentially took a "strawman" negotiating position in December 1986, and ultimately relinquished it in March 1987, which does not constitute fresh consideration.

Finally, defendant argues that HUD's forbearance from terminating the contract for the convenience of the government provided consideration for GMC's requirement to subcontract Section C(4) services. Defendant cites two cases for this proposition. The first case cited, *Robinson Contracting Co. v. United States*, 16 Cl.Ct. at 686, approved of forbearance on the imposition of default termination remedies as a form of consideration. The second case cited by defendant, *Bromley Contracting Co., Inc. v. United States*, 229 Ct.Cl. 750, 751–52, 1982 WL 25947 (1982), characterized the government's relinquishment of unspecified, but under the facts of the case, probably not default "termination and equitable adjustment options," as adequate consideration.

 The government, as a matter of procurement policy, possesses the authority to terminate a contract for the convenience of the government, even in circumstances when a convenience termination clause has been omitted from the contract. *G.L. Christian & Assoc. v. United States*, 160 Ct.Cl. 1, 6, 312 F.2d 418, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963). Here, the 1986 contract incorporated by reference the clause at Federal Acquisition Regulation (FAR) 52.249–4, "Termination for Convenience of the Government (Services)." 48 C.F.R. § 52.249–4 (1987). The government has the right to terminate a contract for the convenience of the government, so long as the government has not engaged in bad faith in doing so. *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1541–42, 1543–44 (Fed. Cir.1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997). In this instance, HUD made the policy decision to separate inspectors from those being inspected through the device of subcontracting out the latter functions. Convenience termination in this context does not reflect bad faith. The government, by forbearing to assert its right to terminate contracts for the convenience of the government, could be deemed to have provided consideration when an agreement is made and performance goes forward. Contractors deeming consideration based on forbearance from convenience termination to be inadequate may decline to agree to a proposed agreement. In the instant situation, as noted above, HUD offered more than such forbearance, and the plaintiff found the whole agreement to be adequate on March 3, 1987 when the Memoranda of Negotiation and Understanding were executed. HUD's forbearance as to convenience termination was accompanied by the extension of the contract term and by HUD's agreement to pay additional amounts beyond the original management fee, discussed above. Consideration on the part of HUD is found in the whole agreement. Therefore, this court concludes that the consideration element of the accord and satisfaction doctrine has been met.

Finally, as with any contract, the creation of an accord and satisfaction is conditioned upon a meeting of the minds. *Texas Instruments Inc. v. United States*, 922 F.2d 810, 815 (Fed.Cir.1990); *King Fisher Marine Serv., Inc. v. United States*, 16 Cl.Ct. at 236–37. In this regard, the United States Court of Claims wrote:

"In order that a performance rendered by an obligor shall operate as a satisfaction of

the claim against him, it must be offered as such to the creditor." *Id.* [Corbin § 1277].

> There must be accompanying expressions sufficient to make the creditor understand or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of this claim and not otherwise. If not so rendered, there is no accord, either executory or executed, for the reason that there are no operative expressions of agreement—no sufficient offer and acceptance.

*Chesapeake & Potomac Tel. Co. v. United States,* 228 Ct.Cl. at 109, 654 F.2d 711 (quoting 6 Corbin on Contracts § 1277 (1962 ed.)) (emphasis in original).

Whether a legally enforceable contract has been formed by a meeting of the minds depends upon the totality of the factual circumstances. *Texas Instruments, Inc. v. United States,* 922 F.2d at 815. Defendant, in its motion for summary judgment, asserts that the March 3, 1987 Modification constituted the settlement of a lingering dispute between Green Management and HUD over the subcontracting issue, and that the signatures of Mr. Porter and Mr. Green reflected evidence of a meeting of the minds of the parties necessary to enter into an accord and satisfaction. Defendant contends that plaintiff knew that HUD wanted Green Management to seek subcontractors to perform the maintenance services set forth in Section C(4) of the contract. After Mr. Green suggested changes to the language presented, which HUD agreed to, he signed the agreements on March 3, 1987, without reservation. Moreover, there is no indication contemporaneous with the March 3, 1987 execution by Mr. Green that the plaintiff would pursue reimbursement in an amount greater than the agreed upon costs by the subcontractors. Indeed, defendant asserts, it is for this reason that Green Management objected so strenuously to the subcontracting requirement prior to the meeting, and why the meeting was held. Defendant further alleges that it was after much careful negotiation, consultation with its attorneys including an opportunity for plaintiff to confer privately with its attorney, and give-and-take on both sides, that Mr. Green made handwritten revisions to the documents, but signed the March 3, 1987 documents without reservations. Defendant asserts that when Mr. Green executed the March 3, 1987 agreement, he clearly understood and agreed to the terms of the total compensation Green Management would receive for obtaining contractors to perform repairs and services enumerated under Section C(4) of the contract as modified.

Plaintiff, however, alleges that it views the circumstances surrounding the March 3, 1987 agreement in a different light. Plaintiff notes that HUD scheduled the meeting between the parties for March 3, 1987 and directed Green Management to appear. Plaintiff characterizes the meeting as reflecting HUD's unilateral decision to modify the 1986 contract, the result of which would be to force Green Management to subcontract the C(4) maintenance services under the contract it had intended to perform fully itself.

Furthermore, in executing the March 3, 1987 documents, plaintiff alleges that Green Management was presented with documents to sign and was subject to the coercion of HUD's directed changes and, thus, acted under duress. Plaintiff argues that Mr. Geiser informed Mr. Green that if Green Management did not agree to the changes detailed in the documents, the 1986 contract would be "terminated." Plaintiff further contends that Mr. Green understood Mr. Geiser's comment to mean that the Green Management contract would be subject to a default termination. Plaintiff argues that it was coerced into selecting between accepting HUD's requirement that Section C(4) maintenance services provided in the contract be subcontracted, or having HUD default plaintiff, and force plaintiff to suffer the loss of the entire contract. There is, however, no indication in the record that Mr. Green, his attorney or his accountant, all present at the March 3, 1987 meeting, asked for clarification of the word "terminated."

 Duress would render the modification void so that there would be no accord and satisfaction. *Systems Tech. Assoc., Inc. v. United States,* 699 F.2d 1383, 1387 (Fed. Cir.1983) Duress has been defined to include three elements, each of which must be satis-

fied: (1) one side involuntarily accepted the terms of another; (2) circumstances permitted no other alternative; and (3) the circumstances were the result of coercive acts of the opposite party. *Id.; see also Fruhauf Southwest Garment Co. v. United States*, 126 Ct. Cl. 51, 62–64, 111 F.Supp. 945 (1953); *Sneeden v. United States*, 33 Fed.Cl. 303, 310 (1995); *United Int'l Investigative Serv. v. United States*, 33 Fed.Cl. 363, 367 (1995); *Coastal Indus., Inc. v. United States*, 32 Fed.Cl. 368, 376 (1994); *McLain Plumbing & Elec. Serv., Inc. v. United States*, 30 Fed. Cl. 70, 82–84 (1993); *Robinson Contracting Co., Inc. v. United States*, 16 Cl.Ct. at 686–88. In order to substantiate the allegation of economic duress or business compulsion, the contractor must go beyond the mere showing of a reluctance to accept a proposal or financial embarrassment. *Fruhauf Southwest Garment Co. v. United States*, 126 Ct.Cl. at 62, 111 F.Supp. 945; *Robinson Contracting Co., Inc. v. United States*, 16 Cl.Ct. at 686–87. Moreover, economic pressure and even the threat of a considerable financial loss alone do not constitute duress. *International Tel. & Tel. Corp. v. United States*, 206 Ct.Cl. 37, 52 n. 11, 509 F.2d 541 (1975) (citing *Du Puy v. United States*, 67 Ct.Cl. 348, 381, 1929 WL 2470 (1929), *cert. denied*, 281 U.S. 739, 50 S.Ct. 346, 74 L.Ed. 1153 (1930)). The assertion of duress must be proven to have been the result of the government's conduct and not the necessity of the contractor. *Fruhauf Southwest Garment Co. v. United States*, 126 Ct.Cl. at 62, 111 F.Supp. 945; *Robinson Contracting Co. v. United States*, 16 Cl.Ct. at 686–87.

■ The gravamen of plaintiff's claim of duress appears to lie in its assertion that Mr. Green understood Mr. Geiser to say that, absent plaintiff's agreement to the terms of the documents presented at the March 3, 1987 meeting, the Green Management contract would be subject to a default termination. During Mr. Geiser's deposition, submitted as part of the record, in response to the question from Mr. Green: "If I don't sign what will happen?" Mr. Geiser stated, "Well you probably will not be able to perform the contract." Later during the deposition, the following colloquy occurred between plaintiff's counsel and Mr. Geiser:

Q Up until the March 3rd meeting, you testified that some terms of the agreement remained unresolved. Was it your feeling, going into the March 3 meeting, that Green Management Corporation could have walked away?

A Yes, very definitely.

Q Would it have been a default on Green Management's part, in your estimation, if Green Management and HUD did not come to any meeting of the minds on [March] 3rd?

A In my opinion, at that point, we couldn't—this is solely my opinion. I mean, we would have had to go through a lot of hoops at HUD. But if he had walked away, there was no meeting of the minds. We had, you know, the issues that we had discussed between September and December and we were there to resolve them. And if we couldn't resolve them, then he could have decided that he didn't want the contract and we would have paid him through his date of performance and had to re-solicit probably.

Mr. Geiser's words are consistent with a convenience termination, which the government has a right to exercise at any time, so long as not in bad faith. *See Krygoski Constr. Co. v. United States*, 94 F.3d at 1541–42, 1543–44. Defendant in its brief properly observes that Green Management has failed to identify evidence in the record of a documented threat of default termination by the government. The government, however, has offered evidence that termination for default was not discussed at the March 3, 1987 meeting and that it was not considered as proper at the time. Even Mr. Green's own affidavit submitted in the instant case does not mention the term "default" in this context, stating: "At the March 3, 1987 meeting, George Geiser stated to me that if GMC did not accept the change, our contract would be terminated." Defendant properly points out that the plaintiff's personal impression on such a critical issue, absent some basis in the record, fails to raise a genuine issue of triable fact. Defendant also notes in its brief that: "Of course, the United States had the right to terminate the contract for conve-

nience, and threats to do what one has the right to do are not coercion or duress unless such actions are deemed to violate fundamental notions of fair dealing."

Furthermore, the plaintiff must overcome the strong presumption that in the absence of clear, contrary evidence, public officials act conscientiously in the discharge of their duties. *Caldwell & Santmyer, Inc. v. Glickman,* 55 F.3d 1578, 1581 (Fed.Cir.1995); *A–Transport Northwest Co., Inc. v. United States,* 36 F.3d 1576, 1585 (Fed.Cir.1994); *Torncello v. United States,* 231 Ct.Cl. 20, 45, 681 F.2d 756, 770 (1982); *Librach v. United States,* 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959). As stated by the United States Supreme Court "[w]e generally accord government records and official conduct a presumption of legitimacy." *United States v. Ray,* 502 U.S. 164, 179, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991). "Since good faith is presumed unless bad faith is shown, the government is prevented only from engaging in actions motivated by a specific intent to harm the plaintiff." *Torncello v. United States,* 231 Ct.Cl. at 45, 681 F.2d 756. The difficult burden of proof for a plaintiff attempting to overcome the presumption that public officials act appropriately and in good faith has been outlined as follows:

> it requires "well-nigh irrefragable proof" to induce the court to abandon the presumption of good faith dealing. *Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631, (1954).

> In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some *specific intent to injure the plaintiff.* Thus, in *Gadsden v. United States,* 111 Ct.Cl. 487, 489–90, 78 F.Supp. 126, 127, (1948), the court compared bad faith to actions which are "motivated alone by malice." In *Knotts, supra,* at 128 Ct.Cl. at 500, 121 F.Supp. at 636, the court found bad faith in a civilian pay suit only in view of a proven "conspiracy ... to get rid of plaintiff." Similarly, the court in *Struck Constr. Co. v. United States,* 96 Ct.Cl. 186, 222, 1942 WL 4411 (1942) found bad faith when confronted by a course of Governmental conduct which was "designedly oppressive." But in *Librach, supra,* at 147

Ct.Cl. at 614, the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff." *Kalvar Corp., Inc. v. United States,* 211 Ct. Cl. 192, 198–99, 543 F.2d 1298 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977) (emphasis in original) (involving allegations of bad faith in contract administration). *See also Sneeden v. United States,* 33 Fed.Cl. at 310–11; *P. Francini & Co., Inc. v. United States,* 2 Cl.Ct. 7, 11 (1983). As stated by the United States Court of Appeals for the Federal Circuit, "[u]nsubstantiated suspicions and allegations [of bad faith actions] are not enough. The proof must be almost 'irrefragable.'" *Spezzaferro v. FAA,* 807 F.2d 169, 173 (Fed.Cir. 1986) (citations omitted). To demonstrate bad faith, specific instances of the government's ill will directed toward the plaintiff must be identified. *Haney v. United States,* 230 Ct.Cl. 148, 152, 676 F.2d 584 (1982).

Plaintiff relies solely on the personal impressions of Mr. Green that the government's reference to "termination" was understood by him to mean a threat of a termination for default. The government, however, has offered contrary information from the record to assert that no threat of a termination for default was made; that plaintiff had the opportunity but did not inquire as to whether the word "termination" may have referred to a possible convenience termination if the parties could not agree following the government's change of policy; and that Mr. Green had an opportunity to privately confer with his attorney during the March 3, 1987 meeting prior to affixing his signature to the Memorandum of Negotiation and the Memorandum of Understanding. Therefore, plaintiff has failed to sustain its burden of proof and has failed to demonstrate, based on the record before the court, that the government acted improperly. Plaintiff was not involuntarily made to execute the Memoranda of Negotiation and Understanding by coercive acts of the government.

 Based on the totality of the facts and arguments presented in the record before

the court, plaintiff has failed to demonstrate the existence of a cardinal change to the 1986 contract. Moreover, the defendant has satisfied the requisite elements to establish a valid accord and satisfaction regarding the modifications to the 1986 contract included in the Memorandum of Negotiation and Memorandum of Understanding, both signed on March 3, 1987. There was extensive correspondence and discussions between the two parties on the issues in dispute, which culminated in the March 3, 1987 meeting. The parties engaged in a "meeting of the minds," after plaintiff had an opportunity to consult privately with counsel, and thus a valid agreement was formed. The Memorandum of Negotiation and the Memorandum of Understanding were executed without reservation in the presence of plaintiff's counsel and with handwritten changes made by the parties prior to the signatures being affixed by both parties. The plaintiff has failed to demonstrate that it was under duress when it signed the March 3, 1987 documents. The language set forth in the Memorandum of Negotiation and Memorandum of Understanding governs the rights of the parties. Therefore, defendant's motion for summary judgment with respect to plaintiff's claim that a cardinal change to the 1986 contract occurred and plaintiff's alternate claim for an equitable adjustment arising from the 1986 contract is **GRANTED**.

Plaintiff's second claim with respect to the 1986 contract is that rather than allowing the 1986 contract to expire on December 1, 1988 by its terms, the contracting officer improperly issued a termination of the 1986 contract for the convenience of the government, effective December 1, 1988. Green Management seeks costs in an amount not less than $122,-262.57, plus accounting, legal and clerical expenses necessary for the preparation of the termination settlement proposal and supporting data. Plaintiff's allegations regarding the termination for convenience claim are best explained with selections, albeit lengthy, from plaintiff's brief. The plaintiff begins by describing defendant's position as follows:

"Defendant's Brief also seeks summary judgment against Green Management's termination for convenience claim for the 109–86–014 Contract.[10] The Government alleges that 'no termination occurred' because the Contract expired on its terms. Defendant further alleges that the 109–86–014 Contract began on December 1, 1986, and ended on November 30, 1988."

To the contrary, plaintiff's brief argues:

Pursuant to § F, ¶ 1(a) and (b) of the 109–86–014 [the 1986] Contract, the Contract commenced on the award date, September 10, 1986, and continued for a one year period with three one-year option years.... Soon after this date a protest was filed in connection with the 109–86–014 solicitation of Contract; this protest was not resolved until on or about November 30, 1986. From these facts Defendant asserts that the 109–86–014 Contract began on December 1, 1986.

A contract's term begins on the date the contract is awarded. An award becomes contractually binding when the Government executes some action evidencing an intent to accept the contractor's solicitation. Thus, because HUD evidenced its intent to accept GMC's solicitation on September 10, 1986, the 109–86–014 period ran from September 10, 1986 to September 9, 1987, with successive option years beginning on September 10 and ending on September 9, the respective years.

\*　　\*　　\*　　\*　　\*　　\*

On August 5, 1988, Mr. Geiser informed GMC that HUD would "not exercise its option to extend [the 109–86–014 Contract] beyond the December 1, 1988 expiration date." The notification informed GMC that HUD was presently withdrawing Properties from Contract 109–86–014 pursuant to § G, ¶ 6. Nonetheless, GMC was to continue to provide services for counties located in the Northeast corner of Wyoming, as well as, one half of Casper. Notwithstanding this notice, HUD did not

10. Plaintiff received a letter addressed to Mr. Green, President, Green Management Corporation, dated October 26, 1988 captioned "NOTICE OF TERMINATION TO PRIME CONTRACTOR" which referenced Contract No. 109–86–065. The 1986 contract at issue in the above-captioned case is Contract No. 109–86–014.

withdraw the other areas of Wyoming and GMC continued to manage Properties for the entire State of Wyoming until December 1, 1988.

From September, 1988 through November, 1988, HUD assigned approximately 183 Properties to the 109–86–014 contract and directed GMC to continue performance on the 109–86–014 Contract. These actions indicate HUD exercised the option provision for the third year under the 109–86–014 Contract. Therefore, the 109–86–014 [1986] Contract was effective until September 9, 1989.

These facts demonstrate that the Contract was effective until September 9, 1989. GMC relied upon the contracting officer's actions in continuing to perform the Contract and dedicated personnel to the AMB services for the option period. The Government is estopped from denying the actions of its agents within the scope of their authority and which are relied upon by others to their detriment. . . .

Based upon the general principles of estoppel and waiver, HUD may not claim the Contract expired on December 1, 1988. Rather, [HUD] is deemed to have exercised its option for the period from September 10, 1988 through September 9, 1989. . . . Consequently, by its actions in assigning approximately 183 Properties to GMC under the Contract from September 1988 through November 1988, and directing GMC to continue performance after September 9, 1988, HUD exercised the option provision for the third year under the Contract.

\* \* \* \* \* \*

Contrary to HUD's assertions, the 1986 Contract did not expire on December 1, 1988. Rather, it was terminated for the convenience of the Government pursuant to the contracting officer's October 26, 1988 letter. By sending the termination for convenience notice in October, HUD officials acknowledged that the 1986 Contract was valid and binding until September 1989, and would not expire upon its own terms in December 1988.

On October 26, 1988, HUD sent GMC a letter indicating that HUD was terminating the 109–86–014 Contract for the government's convenience. Upon receipt of HUD's October 26, 1988 termination notice, GMC began preparing for the termination. GMC submitted a termination settlement proposal to HUD on November 22, 1989. On January 19, 1990, HUD denied GMC's settlement proposal, stating that the 109–86–014 Contract had expired on its own terms on December 1, 1988. HUD did *not* inform GMC that the October 26, 1988 termination notice was "erroneous." In fact, HUD did not indicate its position that the 109–86–014 [the 1986] Contract expired on its own terms until after GMC responded to HUD's October 26, 1988 termination notice.

(Citations and footnotes omitted.)

As described more fully in the fact section of the opinion, the 1986 contact was awarded on September 10, 1986. The 1986 contract, however, was stayed on September 12, 1986, due to a bid protest filed with the Comptroller General. The HUD Contracting Officer ordered plaintiff to suspend performance by telephone. The contracting officer extended a different, 1985 contract with the plaintiff to provide continuing AMB services in Wyoming. Accordingly, during the pendency of the bid protest of the 1986 contract, HUD continued to release properties for AMB service to plaintiff pursuant to Green Management's preexisting 1985 contract with HUD, Contract No. 101–85–094. The bid protest in connection with the 1986 contract was resolved on or about November 30, 1986. Immediately thereafter, on or about December 1, 1986, the contracting officer gave plaintiff notice by telephone that Green Management could commence performance on the new contract. Plaintiff concedes that HUD extended its previous 1985 contract with Green Management during the pendency of the bid protest and that during that time plaintiff was paid pursuant to the 1985 contract.

Two questions are presented under these facts: (1) whether the 1986 contract expired on September 9, 1988 as the plaintiff argues, or on December 1, 1988 as the defendant contends; and (2) whether an option was exercised under the 1986 contract, by

the conduct of the government, then subsequently terminated for the convenience of the government on December 1, 1988. Section F(1)(a) of the 1986 contract provides that "[t]he contract shall commence on the date indicated on page 1 (Section A) of this contract and shall continue for a one 1–year period. . . ." As discussed earlier, by agreement, on March 3, 1987, the one year initial period was extended to two years. The referenced page 1 of the 1986 contract indicates a commencement date of "9–10–86." The issue becomes whether the running of the term of the contract was tolled, during the protest-caused suspension of performance, until December 1, 1988 when the protest was resolved and the suspension of performance was lifted.

Where there has been a protest-based suspension of performance, the contract term may be adjusted under the "Protest After Award" clause found at 48 C.F.R. § 52.233–3 (1987). This clause provides that if a stop-work order is lifted after the protest is resolved, the contractor shall resume work. The contractor then may request an adjustment to the schedule, and the contracting officer shall modify the schedule if the work stoppage resulted in an increase in the time required for contract performance. Though this clause was not specifically incorporated by reference in Section I (Contract Clauses) of the 1986 contract, FAR 33.106(b) provides that it is a mandatory clause in all solicitations and contracts. 48 C.F.R. § 33.106(b) (1987). The court need not reach the issue of whether or not this mandatory, but omitted, clause nevertheless should be read into the 1986 contract, since the contractor never requested, and the contracting officer, therefore, never granted, an extension to the schedule. *See General Eng'g & Mach. Works v. O'Keefe,* 991 F.2d 775, 779–80 (Fed. Cir.1993).[11] This mandatory clause, however, reflects the FAR mechanism in situations when the schedule is impacted by a suspen-

sion of performance. In the instant case, not only did the contractor never request a schedule adjustment, but HUD obtained Green Management's services during the suspension through the use of another contractual vehicle (obviating the need for an extension). Thus, the court concludes that the contract ran from September 10, 1986, as reflected on the face of the contract, and not from December 1, 1986 at the resolution of the bid protest.

The plaintiff next argues that after completion of the two year initial contract term, HUD exercised a one year option, from September 10, 1988 to September 9, 1989, which was terminated early for the convenience of the government on December 1, 1988. The plaintiff requests termination settlement costs. FAR 17.208(f) provides that the contracting officer shall insert a clause substantially the same as the clause at FAR 52.217–8, "Option to Extend Service," when the inclusion of an option is deemed appropriate. 48 C.F.R. § 52.217–8 (1987). Pursuant to this direction, the contract at issue, at Section F(1)(b), contains the following language:

(1) The Government may extend the term of this contract at its sole discretion for three 1–year periods by written notice to the Contractor.

&ast; &ast; &ast; &ast; &ast; &ast;

(3) Notice of such extension will be furnished to the Contractor at least 90 days before the contract expires.

This contract clause tracks the clause at FAR 52.217–8 in that both require that an option be exercised by written notice. The same requirement is found in FAR 17.207(a): "When exercising an option, the contracting officer shall provide written notice to the contractor within the time period specified in the contract." 48 C.F.R. § 17.207(a) (1987). The United States Court of Appeals for the Federal Circuit has held that an option must

---

11. The court in *General Eng'g & Mach. Works v. O'Keefe* set out guidelines for when to read omitted clauses into government contracts:

Thus, under the Christian Doctrine a court may insert a clause into a government contract by operation of law if that clause is required under applicable federal administrative regulations. However, the Christian Doctrine does not

permit the automatic incorporation of every required contract clause . . . .

Accordingly, the Christian Doctrine applies to mandatory contract clauses which express a significant or deeply ingrained strand of public procurement policy.

*General Eng'g & Mach. Works v. O'Keefe,* 991 F.2d at 779 (citations omitted).

be exercised "in exact accord with the terms of the option." *Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d 319, 323 (Fed.Cir.1997) (quoting Corbin on Contracts § 284 (1963)) (also citing *New England Tank Indus. v. United States,* 861 F.2d 685, 687 (Fed.Cir.1988)). In the instant case, the 90–day written notice was not provided to Green Management to exercise the option. Oral exercise of an option is not adequate. *See International Tel. & Tel. v. United States,* 197 Ct.Cl. 11, 17, 29, 453 F.2d 1283 (1972) (telephonic notification, absent written notice, was found insufficient). Moreover, in the case at bar, on August 5, 1988, the Chief of HUD's Regional Contracting Branch informed Green Management that HUD would " 'not exercise its option to extend [the 1986 contract] beyond the December 1, 1988 expiration date.' " Though HUD was incorrect on the expiration date of the 1986 contract, as discussed above, HUD provided clear notice to Green Management that options would not be exercised under the 1986 contract, and did so prior to the true expiration of the contract on September 9, 1988. In fact, Green Management was aware that HUD intended to use a different contractual vehicle to procure area management broker services for Wyoming—the 1988 Contract (No. 109–89–005) awarded to Green Management (which is the focus of the termination for default issue also presented in this case). Green Management had submitted its initial proposal on June 6, 1988 and its best and final offer on September 1, 1988, in competition for the 1988 contract. Award of Contract No. 109–89–005 was made to Green Management on December 1, 1988.

HUD sent a letter to Green Management on October 26, 1988, purporting to terminate for the convenience of the government on December 1, 1988 "Area Management Broker (AMB) Contract No. 109–86–065 with the U.S. Department of Housing and Urban Development (HUD) for the Wyoming area." The correct Contract No. for the 1986 contract was 109–86–014. Defendant argues that the termination notice was erroneously sent, since under defendant's view the contract expired normally on December 1, 1988. In fact, as indicated above, the contract expired normally on September 9, 1988, and so was not subject to the subsequently and erroneously issued termination for the convenience of the government.

■ Green Management, however, also argues that

From September, 1988 through November, 1988, HUD assigned approximately 183 Properties to the 109–86–014 contract and directed GMC to continue performance on the 109–86–014 Contract. These actions indicate HUD exercised the option provision for the third year under the 109–86–014 Contract.

(Citation omitted.) The government responds that the properties actually were assigned pursuant to the 1988 contract. In any event, as suggested above, oral communication, or for that matter, conduct, are not competent to exercise an option under the 1986 contract. Options must be specifically exercised in writing. If Green Management performed work for HUD between September 10, 1988 and the start of the 1988 contract on December 1, the work was unauthorized and undertaken at the contractor's risk. *See Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947).[12] Plaintiff's request for summary judgment on the issue of the government's alleged termination for convenience is **DENIED**. Defendant's motion for summary judgment on this issue is **GRANTED**.

Finally, plaintiff raises two claims for relief with respect to Contract No. 109–89–005 (the 1988 Contract), entered into on December 1, 1988. First, plaintiff alleges that HUD breached the 1988 contract by acting in bad faith in terminating the contract for default. In support of this allegation, plaintiff contends that the decision of the contracting officer to terminate the 1988 contract "was motivated, partially or totally, by an intent to retaliate against GMC for its complaints which had uncovered violations of federal labor and procurement statutes." Plaintiff

---

**12.** Ratification is a potential remedy within an agency's discretion to redress any unauthorized commitments found. *See* 48 C.F.R. § 1.602–3 (1998) and J. Cibinic, Jr. & R. Nash, Jr., *Formation of Government Contracts* 98–106 (3d ed.1998).

further contends that there was no valid basis for the default termination of the 1988 contract, that the contracting officer failed to respond to the attempts of Green Management to correct alleged deficiencies, and that the contracting officer's motivations and actions in terminating the 1988 contract constituted bad faith and an abuse of discretion by the contracting officer. Second, if it is determined that Green Management was not in default or that the default was excusable, plaintiff requests that the court recognize the rights and obligations of the parties as if the termination had been issued for the convenience of the government.

 Defendant contends that the assertion of Green Management that HUD acted in bad faith must be rejected by the court as a matter of law. As discussed above, government officials are presumed to have acted in good faith and in order to prevail on the claim of bad faith, the plaintiff must overcome that strong presumption with clear, contrary evidence.

In support of its allegations of bad faith, plaintiff relies on the deposition of Mr. Green, President of Green Management. For example, Mr. Green noted at his deposition that a HUD employee, Don Bahr, had indicated bad faith as follows:

Q Okay. Why don't we take these one by one. What exactly did [HUD employee] Mr. Bahr say to you?

A I do not know exactly. In a number of conversations, Mr. Bahr said that HUD was going to get rid of us.

\* \* \* \* \* \*

Q What do you mean? Mr. Bahr never told you that Green Management had failed to inspect a property properly or return its reports in on time or anything like that?

A He did.

Contractors who fail to adequately perform according to determinations made by agency officials can be terminated. Mr. Green's allegations, absent further documentation, do not alone demonstrate bad faith.

In response to further questions, Mr. Green continues:

Q Again, as I said right before the break, in your complaint you allege that HUD, in bad faith, terminated your '88 contract. So I just want to know all the facts and circumstances that make you allege that.

A Well, all of the circumstances would go back into the '86 contract.

Q Okay.

A I met with Grady Maples [HUD Regional Administrator] in his office, after I had gone through the chain of command of HUD officials, and informed him that his subordinates were treating Green Management Corporation unfairly; that they had awarded a contract to us and had changed the contract; that after award of the contract, they did not release the entire state to us; and that they were making me drive across the entire state of Wyoming for two houses on the western side of the state. His letter response at some point, kind of a summarization, was that HUD was doing everything correctly.

\* \* \* \* \* \*

Q You ultimately were given the properties—on the '86—properties throughout the state, right?

A Approximately five months or so afterwards. I mean, I suffered a lot of costs. We were into—several months into the contract. That wasn't the agreement on the contract.

Modification of the 1986 contract and/or delay are not a-typical contract administration events in government procurements and also do not by themselves support charges of bad faith in the 1988 contract.

Mr. Green continues:

Q Okay. Now, Ms. Beckham [HUD Chief of Property Disposition], did you think she acted in retaliation for your complaints?

A Her correspondence shows that she was acting in bad faith, in my estimation.

\* \* \* \* \* \*

Q Isn't it possible that there could be a difference of opinion between HUD and Green Management as to the completeness of your response [to HUD]?

A No.

Ms. Beckham's deposition placed HUD's treatment of the plaintiff and Mr. Green's deposition in a performance context:

Q You say you do have a recollection that in some fashion you got the impression that Green Management was not considered to be one of your best AMBs [area management brokers]?

A Correct.

Q Can you tell me how you would have gotten that impression?

A From the realty specialist who worked the area.

\* \* \* \* \* \*

[Question omitted in record.]

A Okay. Our operations section started close monitoring of the new workups that came in. And it came to my attention that Green Management was not getting the workups in a timely manner, or if they came in, they were not complete. Therefore, we were unable to put the property on the market in a timely manner. I think we were given—I don't remember, 10 or 15 days to get it on the market. It must have been 15—

Q 10 or 15 days by who[m]?

A Washington.—[T]o get the property on the market from the time we acquired it. I don't remember if it was 10 or 15.

Q Can you tell me specific[ally]—number one, when you say operations started closely monitoring the new workups, was that just for Green Management corporation?

A Oh, no.

Q That was for all AMBs?

A Yes.

Q And you indicate that it came to your attention that the workups from Green Management were slow or incomplete?

A Yes.

\* \* \* \* \* \*

Q All right. Would you tell me every step that you recall that you personally took to find out about the property and deal with it?

A Well, I discovered the problems, as I said earlier, through my computer reports.

I questioned the salespeople and I questioned operations people why it was taking so long to get the properties advertised, and we found that it was taking so long to get them advertised because we had not gotten the workups back in a timely manner.

\* \* \* \* \* \*

Q Did you look at anything in writing, any evaluations of Green Management that you can recall?

A I recall that Joyce Jacoby wrote to Green Management about some problems. Green Management wrote back and said that they had—well, that they had included certain reports with the letter and also that a number of things were completed. At that time either Joyce or Don Bahr or both—I don't know—went to Wyoming. Work still had not been done, work that Green Management said had been done, and at that time I wrote a memo to George Geiser and recommended default.

\* \* \* \* \* \*

Q And where did the complaints about Green Management come from; operations or sales?

A Sales—both.

Q Mostly from sales?

A Mostly from sales.

Q And the complaints were what?

A Well, we talked about this earlier, but the complaints were, [w]here are your workups. They're not complete. What about the systems checks? They aren't being done. You know, what are we going to do about this company?

The plaintiff essentially equates performance disputes with bad faith on the part of the government officials involved in the contract management. Without further support in the record plaintiff's allegations remain unfounded suspicions. Plaintiff's allegations of bad faith fail to raise factual material issues sufficient to rebut the presumption of good faith accorded to government officials. *See Librach v. United States*, 147 Ct.Cl. at 612; *Torncello v. United States*, 231 Ct.Cl. at 45, 681 F.2d 756. Mr. Green's vague testimony, standing alone, fails to identify the

necessary specific instances of the ill will on the part of the government toward plaintiff to demonstrate bad faith. *Haney v. United States,* 230 Ct.Cl. at 152, 676 F.2d at 586; *see also A–Transport Northwest Co., Inc. v. United States,* 27 Fed.Cl. at 206. Indeed, the statements of Mr. Green, the only evidence that plaintiff cites to in this record, are properly characterized as the type of "unsubstantiated suspicions and allegations" that fail as a matter of law to meet the "irrefragable" proof standard articulated by the United States Court of Appeals for the Federal Circuit in *Spezzaferro v. FAA,* 807 F.2d at 173.

 Despite plaintiff's failure to articulate a basis for its claim of bad faith, the court, nevertheless, looks to the standards set forth in FAR 52.249–8 to determine whether, absent bad faith, HUD, in its termination of the 109–89–005 Contract, violated applicable regulatory standards. FAR 52.249–8 provides in pertinent part:

### DEFAULT (FIXED–PRICE SUPPLY AND SERVICE) (APR 1984)

(a)(1) The Government may, subject to paragraphs (c) and (d) below, by written notice of default to the Contractor, terminate this contract in whole or in part, if the Contractor fails to—

(i) Deliver the supplies or to perform the services within the time specified in this contract or any extension;

(ii) Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) below); or

(iii) Perform any of the other provisions of this contract (but see subparagraph (a)(2) below).

(2) The Government's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) above, may be exercised if the contractor does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

48 C.F.R. § 52.249–8 (1987). As specified in the factual account included in this opinion, Contracting Officer John Parker issued a Notice of Termination to Green Management

on May 24, 1989, by which the contract was terminated on that date. This letter was followed by an amended notice issued June 2, 1989 by George Geiser, Chief of the Contracting Branch. Attached as a cover sheet to the June 2, 1989 notice was a letter to Mr. Green from Mr. Geiser which noted:

> Because of concerns about the clarity of the May 24th Notice we are amending that Notice as per the enclosure attached to this letter. In the enclosed Notice, we have clarified certain provisions, added a statement of your appeal rights, and deleted unnecessary provisions. To the extent that provisions in the May 24th notice are inconsistent with the provisions of the enclosed Notice, the provisions in the May 24th notice should be disregarded.

Both the initial and amended notices specify, as required by the regulations, the character of the communication as a default termination. Furthermore, a cure notice, though not required by paragraph (a)(1)(i) of FAR 52.249–8 (failure to perform services within the time specified), was provided to the plaintiff by letter dated February 10, 1989, as well as another letter dated March 2, 1989, and a Show Cause Notice dated May 8, 1989. Finally, the court notes that plaintiff fails to controvert defendant's assertions that plaintiff submitted tardy and incomplete reports in violation of Section C(3)(c) of the contract. Indeed, Mr. Green, President of Green Management, admitted at his deposition that problems with subcontractors caused Green Management to submit untimely and incomplete inspection reports:

Q Now, you said you had a problem with your contractors and them not getting reports to you in on time, right?

A That's correct.

Q And you said HUD was insufficiently sympathetic for your telling them the reason the reports were late was because of the contractors, right?

A I did not say our reports were late. They would not treat us equally. HUD did not want us to have the '88 contract.

Q Well, maybe I misunderstood you. Your said Ms. Beckham was tough on you because she wouldn't release you from the

due dates because—on the basis that your contractors weren't getting their systems checks in on time.

A I didn't ask her for a release on the due dates.

Q You said Ms. Beckham was tougher on you than on other AMBs because she wouldn't let you do it so that you could make the deadline when your contractors weren't performing. Is that a better characterization of your testimony?

A That's better.

Q Okay. Did your contractors cause you to submit late initial inspection reports?

A I submitted the initial inspection reports with all of the documents that Green Management could perform in a timely fashion.

Q And if Green Management couldn't perform it, something—if it was required to be subcontracted out, what did you do?

A I submitted it without their check.

Q And then you supplemented it once the subcontractor's work came in?

A That's correct.

Q Okay. And—

A But they rejected those.

Q Who rejected them?

A Fran Beckham.

Q And you think that's unfair?

A She sent them back and wouldn't date them in.

Q And you think that was unfair of her to reject incomplete inspection reports?

\* \* \* \* \* \*

A It wasn't right.

Furthermore, Green Management's responses to HUD in letters dated February 10, 1989 and May 11, 1989, reflect plaintiff's failure to perform services within the time required.

The language of the 1988 contract incorporated in Section E, "Inspection of Services— Cost–Reimbursement (APR 1984)" provides, in pertinent part:

(a) Definitions. "Services," as used in the clause, includes services performed, workmanship, and material furnished or used in performing services.

(b) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires.

(c) The Government has the right to inspect and test all services called for by the contract, to the extent practicable at all places and times during the term of the contract. The Government shall perform inspections and tests in a manner that will not unduly delay the work.

(d) If any of the services performed do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, for no additional fee. When the defects in services cannot be corrected by reperformance, the Government may—

(1) require the Contractor to take necessary action to ensure that future performance conforms to contract requirements and

(2) reduce any fee payable under the contract to reflect the reduced value of the services performed.

(e) If the Contractor fails to promptly perform the services again or take the action necessary to ensure future performance in conformity with contract requirements, the Government may—

(1) by contract or otherwise, perform the services and reduce any fee payable by an amount that is equitable under the circumstances or

(2) terminate the contract for default.

Plaintiff specifically admitted to failing to comply with the contractual requirement that inspection reports be submitted within 10 days. Thus, in accordance with the above-quoted clause of the 1988 contract, it was within the discretion of the Contracting Officer to terminate the contract for default. For the reasons discussed above, defendant's motion for summary judgment on the propriety of the termination for default with re-

spect to Contract No. 109–89–005 is **GRANTED.**

### *CONCLUSION*

After careful review of the record before this court and of the applicable law, the court concludes that defendant has met its burden of proof on summary judgment on all claims before the court. Conversely, plaintiff has failed to meet its burden on summary judgment on these claims. For the reasons discussed above, defendant's motion for summary judgment is **GRANTED.** Plaintiff's cross-motion for summary judgment is **DENIED.**

**IT IS SO ORDERED.**